NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0715n.06

No. 12-1500

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

RALPH ELDRIDGE,                              )
                                             )        **FILED**
        Plaintiff-Appellee,                  )        *Aug 05, 2013*
                                             )        DEBORAH S. HUNT, Clerk
v.                                           )        ON APPEAL FROM THE UNITED
                                             )        STATES DISTRICT COURT FOR
CITY OF WARREN,                              )        THE EASTERN DISTRICT OF
                                             )        MICHIGAN
        Defendant,                           )
                                             )
PATRICK K. MOORE, Police Officer,            )        OPINION
ROBERT HORLOCKER,                            )
                                             )
        Defendants-Appellants.               )
                                             )

Before:  NORRIS, MOORE, and DONALD, Circuit Judges.

**BERNICE BOUIE DONALD, Circuit Judge.**  What constitutes "active resistance" by a suspect that justifies a police officer's use of force?  In their pursuit of qualified immunity, two police officers ask us to conclude that a lethargic driver who clutched his car's steering wheel and provided unhelpful responses to the officers' queries was engaged in "active resistance."  We decline to do so, and **AFFIRM** the decision of the district court.

I.

On the morning of June 18, 2009, the Warren Police Department received a call complaining of a man erratically driving a truck on Stephens Road.  Maria Tramble, the caller, suspected that the driver was drunk.  She watched as the truck drove into her condominium complex, over a curb, and

through patches of grass. It eventually came to a halt at a construction area, with further progress stifled by temporary construction barricades. Understandably concerned, Tramble called the police again.

Officers Patrick Moore and Robert Horlocker were dispatched to the scene, where a dashboard camera recorded the events that followed.[1] When they arrived, the two officers found the truck parked behind the barricades it had knocked over. The motor was still running.

Officer Moore approached the driver's side window of Ralph Eldridge's truck, with Officer Horlocker placing himself on the passenger's side. Moore asked, "What's going on?" Eldridge, sitting in the driver's seat, muttered something inaudible. Moore tried again by inquiring, "What are you doing?" The response was incomprehensible. "Turn the car off," Moore commanded. Eldridge's response was, yet again, inaudible. Moore attempted to open the driver's side door, found it locked, and repeated his command: "Turn the car off." He unlocked and opened the door. Having obtained access to the steering wheel, Moore turned off the car's ignition and removed the key.

With the truck immobilized for the moment, Moore chided Eldridge for his erratic driving by shouting, "What are you doing? You ran over the parking lot, you're driving all over the lawn. What are you doing?" The officer began inspecting the immediate area around Eldridge. "Step on out," Moore demanded once more. His partner opened the passenger-side door.

As Eldridge was unresponsive to Moore's instruction, the officer repeated his command: "Step on out." Eldridge's reply was a softly-spoken "I'm fine, thank you." "Step on out. You ain't

---

[1] Although certain aspects of the video are not entirely clear, we have drawn all inferences in favor of Eldridge, as we must at this stage.

going nowhere," Moore responded. The driver's reaction remained the same, with him muttering the words, "I'm fine."

Horlocker began inspecting the other side of the truck. At this point, Moore's commands became variations of the same refrain. Similarly, there was no change to Eldridge's response. Moore tried again by saying, "Come on out. I'm not going to tell you again." The response? "I'm fine." Horlocker joined his colleague by shouting, "Get out of the car!" A cacophony of commands surrounded Eldridge as both officers demanded his compliance.

Standing next to the open passenger-side door, Horlocker remarked, "There's not even keys in there." Moore tried the same by adding, "There's not a key in there, it's not going to go anywhere. Step out of the car. Come on out."

That, too, had little effect. Stymied by the seemingly uncooperative Eldridge, Moore asked, "You coming out, or do I have to help you out?" "I'm fine," said the sluggish driver. Moore began tugging at Eldridge's arm. He coupled this with a new form of persuasion—a threat. "Come on out. I'm not – I'm going to tell you to get out of this car one more time, if you don't get out, I'm going to shoot you with a Taser," Moore warned. He sought confirmation by inquiring, "You got it? You gonna get out of the car?" Horlocker chimed in once more by asking, "Get out, what's so hard about that?"

Finding his tugs of Eldridge's arm and his commands unsuccessful, Moore yelled, "I'm not going to tell you again. Get out of the car. Get out of the car or you're going to get Tasered. You wanna get Tasered?" Eldridge's response? "I'm fine." By this point, Horlocker had joined his partner at the driver's side of the truck. Both officers tugged at Eldridge's left arm to pull him out

of the car, repeating their demands for him to exit the vehicle. In the midst of their shouting, Eldridge could be heard saying, "I'm trying to . . . "— but he was cut off. Horlocker drowned out Eldridge's voice by shouting, "Get out of the goddamn car!" Moore yelled, "Get out of the car, let go of the steering wheel and get out of the car!" Horlocker warned, "You're going to get Tasered!" Moore did the same. Horlocker then commanded, "Step out of the truck!" Moore gave one final caution by exclaiming, "I'm not telling you again. Get out!" His partner added, "Out, let's go!"

Two minutes and nine seconds after the encounter began, Officer Moore activated the Taser, causing Eldridge to thrash about erratically while yelling "I'm fine!" After Eldridge crashed into a temporary construction barricade, the officers grabbed him and pinned him to the side of his car. They repeatedly yelled, "Get on the ground!" Eldridge seemed slow to comply. "Get on your knees!" Horlocker instructed. Eldridge weakly responded, "I'm trying." He slowly began lowering his knees.

Moore grabbed Eldridge and pushed him to the ground into the prone position with his partner's assistance. Someone shouted, "Get on the fucking ground!" Moore placed his knee at Eldridge's neck, causing Eldridge to hit his head on the pavement in the process. In the meantime, Horlocker began handcuffing Eldridge, with both officers continually demanding his compliance. After Eldridge was secured, Horlocker began searching his body. A few seconds later, the officer found something. Moore remarked, "What the fuck is that?" They ultimately concluded that it was an insulin pump.

Eldridge was a diabetic. He was suffering from a hypoglycemic episode.

Seeking recompense for his ordeal, Eldridge filed suit under 42 U.S.C. § 1983, alleging violations of the Fourth Amendment's prohibition against the use of excessive force. He later amended his complaint to allege an additional Eighth Amendment violation for the officers' deliberate indifference to his medical condition.

At the close of discovery, Moore and Horlocker moved for summary judgment, asserting that qualified immunity shielded them from liability for the Fourth Amendment claim and that there was insufficient evidence to support the Eighth Amendment claim. The district court granted summary judgment on the latter issue, but declined to conclude that qualified immunity applied for Eldridge's excessive force claim.[2] Moore and Horlocker timely filed an interlocutory appeal.

II.

We review *de novo* a district court's decision to deny summary judgment on qualified-immunity grounds. *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). Summary judgment is only appropriate if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in the non-movant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Our jurisdiction to review denials of qualified immunity is limited only to the question of "whether the plaintiff's facts, taken at their best, show that the defendant violated clearly established law." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013). Because our focus is

---

[2] It did, however, dismiss Eldridge's Fourth Amendment claim insofar as it challenged his handcuffing.

restricted to this discrete question of law, "'a defendant must concede the most favorable view of the facts to the plaintiff for purposes of the appeal.'" *Id.* (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 309-10 (6th Cir. 2005)).

In determining whether the doctrine of qualified immunity shields a government official from § 1983 liability, we look to two oft-discussed factors: (1) whether the action violated a constitutional right; and (2) "whether that constitutional right was clearly established such that a 'reasonable official would understand that what he is doing violates that right.'" *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 443-44 (6th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). We have the discretion to conduct this analysis in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

A.

To determine whether the use of force was excessive for purposes of the Fourth Amendment, "we employ an 'objective reasonableness' test, which requires consideration of the totality of the circumstances." *See Kijowski v. City of Niles*, 372 F. App'x 595, 598 (6th Cir. 2010). This reasonableness inquiry presents the overarching question of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). While the "ultimate question is whether the totality of the circumstances justifies a particular sort of seizure," *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (citation and internal quotation marks omitted), we are aided by three guideposts that facilitate our determination of whether a particular encounter necessitated the use of force. These factors are: "the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

From the outset, we note that the first two factors are not at issue here. The severity of the crime at issue could not justify the type and degree of force used in this incident. Eldridge was suspected of driving under the influence. Such a crime is undoubtedly serious, but not categorically "severe" nor "severe" on this particular occasion. *See Begay v. United States*, 553 U.S. 137, 145 (2008) ("[S]tatutes that forbid driving under the influence . . . typically do not insist on purposeful, violent, and aggressive conduct . . . ."); *see also Martin v. City of Broadview Heights*, 712 F.3d 951, 958-59 (6th Cir. 2013) (examining the specific factual circumstances in evaluating the severity of the crime); *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) (looking to the categorical nature of the crime of apprehension in assessing its severity). Twenty seconds had elapsed between Officer Moore's initial approach to the driver's side window and his act of turning off the ignition to Eldridge's truck. Taking the facts in the light most favorable to Eldridge, a reasonable jury could conclude that Eldridge was going nowhere.

The facts also belie the notion that Eldridge posed "an immediate threat to the safety of the officers or others." Once Officer Moore turned the car off, Eldridge posed little risk to the public at-large. As for the safety of the officers, the facts taken in the light most favorable to Eldridge require reaching the conclusion that Eldridge presented no risk—he was not threatening either verbally or physically, as demonstrated by his polite responses to the officers' questions about his physical incapacity to move from his stationary vehicle. Insofar as the officers argue that Eldridge's

stature was physically imposing to the officers, a review of the video reveals that Eldridge was no taller or larger than either of the two officers dispatched to the scene.

B.

The true flashpoint of this controversy is the third *Graham* factor—whether Eldridge "actively resisted" in a manner that warranted the use of a Taser. To Officers Moore and Horlocker, Eldridge was noncompliant and therefore actively resisting. They argue that their actions are protected under our precedent establishing that when an officer employs a Taser on a suspect who is actively resisting, such action does not constitute excessive force. We disagree. Taken in the light most favorable to Eldridge, a reasonable officer faced with the same circumstances could not have determined that Eldridge's actions bore the hallmarks of active resistance. Rather, these facts demonstrate that Eldridge was not actively resisting, and under our precedent it is unreasonable to tase a nonresisting suspect. *See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012).

In making their argument that Eldridge was actively resisting, the officers point to three facts: (1) Eldridge was in control of a running vehicle, (2) Eldridge was gripping the steering wheel, and (3) Eldridge failed to comply with the officers' repeated demands for him to get out of the car. The first two arguments are easily disposed of. A review of the facts in the light most favorable to Eldridge indicates that the officers turned off the car and removed the keys from the ignition. For our purposes, then, Eldridge was not in control of a running vehicle at the time of the purported excessive force. Similarly, it remains disputed whether Eldridge was gripping the steering wheel. Under Eldridge's version of the facts, as explained by the district court, he was merely sitting behind

the steering wheel, a fact we must consider to be true on interlocutory appeal. Because these facts are in dispute, neither can serve as a basis to reverse the district court on its qualified-immunity determination.

Whether the officers receive qualified immunity thus turns on whether failing to comply with an officer's commands, with nothing more, constitutes active resistance. What makes the officers' argument difficult to accept on this issue, however, is the meaning of "active resistance" under our precedent. In cases where we concluded that an officer's use of force was justifiable because it was in response to active resistance, some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance, neither of which is present here.

Take, for example, our decision in *Caie v. West Bloomfield Township*, 485 F. App'x 92 (6th Cir. 2012). There, we concluded that a suspect was actively resisting arrest because he refused to move his arms from underneath his body so as to facilitate handcuffing. *Id.* at 94, 96-97. But this act of noncompliance was not evaluated in isolation; rather, it was the final straw in a series of consciously-resistive acts, one of which included a statement that the suspect would "fight the officers so that they would have a reason to kill him." *Id.* at 94. That statement, along with a lack of physical cooperation, demonstrated a deliberate choice to be defiant.

Consider, too, the circumstances in *Hagans*. In that case, the suspect had been physically active—he resisted arrest by laying down on the pavement and deliberately locking his arms tightly under his body while kicking and screaming so as to avoid arrest. *Hagans*, 695 F.3d at 507. We noted that these actions indicated that the suspect was "out of control" and "forcefully" resisting arrest. *Id.* at 511. This justified an officer's use of a Taser.

Perhaps the best case for comparison is our decision in *Foos v. City of Delaware*, 492 F. App'x 582 (6th Cir. 2012). There, a police officer parked his car behind a Ford F-150 truck that had crashed into a concrete pillar. *Id.* at 584. The officer stayed in his patrol car and attempted to catch the wayward driver's attention with his cruiser lights. *Id.* Instead of responding, the suspect accelerated his car while keeping it stationary, creating a plume of smoke with his tires. *Id.* Concerned by the erratic behavior, the officer called for backup. *Id.* at 584-85.

Once backup arrived in *Foos*, the suspect reached into the backseat, giving officers the impression that he was reaching for a weapon. *Id.* at 585. Finding it necessary to disable the vehicle, the officers used an axe to break the driver's side window. *Id.* In response, the suspect intentionally revved up the vehicle "to the point [that] the tires were spinning at a very high rate of speed and the area was filling up with smoke again." *Id.* Feeling threatened by the breaking of the window, the suspect also began violently thrashing about. *Id.* At that point, the officers deemed it necessary to use a Taser. *Id.* 585-86.

In *Foos*, we determined that the officers' use of the Taser was reasonable. Several factors indicated that the suspect had actively resisted arrest. One consideration was the suspect's repeated refusal to comply with the officers' demands. *Id.* at 590. But again, this noncompliance was not viewed in isolation—instead, it was viewed in conjunction with the fact that the suspect was hostile, belligerent, and had thrashed about in an agitated state. *See id.* The suspect's stationary acceleration of the vehicle was the capstone that accentuated his active resistance. *See id.*

As in *Foos*, this case presents a circumstance where police officers confronted a driver whose truck had crashed into a temporary barricade. That is where the similarities between the two cases

end. Unlike the officers in *Foos*, Officers Moore and Horlocker had encountered no problems in approaching Eldridge's truck. When Officer Moore reached in through the driver's side window to turn off the ignition, Eldridge did not thrash about or attempt to accelerate the car to get away. Instead, he was without reaction, exhibiting neither hostility nor belligerence.

If there is a common thread to be found in our caselaw on this issue, it is that noncompliance alone does not indicate active resistance; there must be something more. It can be a verbal showing of hostility, as was the case in *Caie*. It can also be a deliberate act of defiance using one's own body, as in *Hagans*, or some other mechanism, such as the truck in *Foos*. Taken in the light most favorable to Eldridge, his noncompliance was not paired with any signs of verbal hostility or physical resistance, and therefore cannot be deemed active resistance. *See also Coles v. Eagle*, 704 F.3d 624, 629-30 (9th Cir. 2012) ("We have drawn a distinction between passive and active resistance, and failing to exit a vehicle is not active resistance and does not justify the officers' actions." (modifications and quotation marks omitted)).

When the totality of the circumstances is considered, it is clear that the interaction at issue here does not follow the typical course of active resistance. Generally, a confrontation leading to an excessive-force suit unfolds in a manner where the suspect causes the officers to be exposed to volatility, hostility, and danger in a way that increases with the passage of time, thus justifying (and often requiring) the use of force. *See, e.g.*, *Lawrence v. Bloomfield Twp.*, 313 F. App'x 743 (6th Cir. 2008). Here, we have the opposite—Officers Moore and Horlocker approached Eldridge's vehicle and disabled it without incident. During the sequence of events that followed, the only individuals

conveying any sense of aggression were the two officers. Eldridge played no role in escalating the aggression. Under our precedent, such a scenario does not justify the use of a Taser.

C.

We further note that the two officers' actions violated a clearly-established right: the right of a suspect to be free from the use of physical force when he is not resisting police efforts to apprehend him. *See Hagans*, 695 F.3d at 509 (summarizing cases from 2004 onwards in which "the suspects were compliant or had stopped resisting" and noting that excessive force was found in such cases); *Kijowski*, 372 F. App'x at 601 ("[T]he right to be free from physical force when one is not resisting the police is a clearly established right." (internal quotation mark omitted)). We are mindful of the Supreme Court's caution to not define rights "at a high level of generality," *see Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011), but drawing the line at a suspect's active resistance sufficiently narrows the right to achieve an adequate level of particularity. *See Hagans*, 695 F.3d at 509.

In addition, the law was clear at the time of the alleged violation. *See generally Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful."). Our decision in *Hagans* clarified that this particular right was "clearly established" before and after May 2007—and more importantly for our purposes, before June 2009. *See Hagans*, 695 F.3d at 509; *see also Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008).

Having discerned a constitutional violation and the clearly-established nature of the right underlying that violation, we conclude that the district court properly denied qualified immunity for the allegations arising from the use of the Taser. Accordingly, we affirm that aspect of the district court's denial of summary judgment.

III.

We are left with one residual issue: whether Officer Moore's use of his knee in an attempt to keep Eldridge pinned to the ground constituted excessive force. The officer claims that Eldridge was resisting arrest because "his right arm was supporting his body off the ground, contrary to the officers' commands to lay on the ground." Eldridge rejoins that he was not resisting arrest. Rather, he argues, he "was attempting to comply with the officers' commands" as evidenced by the fact that he "can be audibly heard indicating he's *trying* to comply with [their] commands." Alternatively, he contends that he was not actively resisting because he "was simply unable to comply with the Defendants' commands due to his medical condition and combined with the fact that he had been tasered, twice." *Id.* Taken in the light most favorable to Eldridge, as we must on interlocutory appeal, the video demonstrates that he was attempting to comply with the officers' requests. We therefore affirm the district court's denial of qualified immunity with respect to Officer Moore's use of his knee.

IV.

For the reasons provided above, we **AFFIRM** the district court's denial of summary judgment.

No. 12-1500
*Eldridge v. City of Warren et al.*

**NORRIS, Circuit Judge, dissenting.** The majority paints a compelling picture of a softly spoken driver offering "polite responses to the officers' questions about his physical incapacity to move from his stationary vehicle" who was nevertheless tased by defendant officers.

In painting this picture, the majority avers, as it should, that it is construing the facts in the light most favorable to plaintiff. However, this case is unusual two respects: first, the entire sequence of events was caught on the police cruiser's dashboard camera; and, second, plaintiff concedes that he has no recollection of the events. When uncontroverted video evidence is available, we should view "the facts in the light depicted by the video tape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *see also Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) ("Although we review evidence in the light most favorable to the nonmoving party, we assign greater weight, even at the summary judgment stage, to the facts evident from the video recordings taken at the scene."). Because the majority relies upon facts contradicted by the clear video evidence, I respectfully dissent.

As the majority notes, when a suspect is not actively resisting police efforts to apprehend him, there is a clearly established right to be free from the use of physical force. *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (summarizing cases from 2004 onwards in which "the suspects were compliant or had stopped resisting" and noting that excessive force was found in such cases). That maxim is true, but it is equally well-settled that the right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Having reviewed the video tape of the encounter between plaintiff and the officers numerous times, the events captured strike me as a fairly routine arrest of an uncooperative driver whom the officers had reason to suspect was under the

- 14 -

influence of alcohol.[1] In the course of their encounter he refused to comply with repeated, reasonable police commands and physically resisted the officers' efforts to remove him from his vehicle.

The majority believes that plaintiff was attempting to comply with the officers' commands but was physically incapable of doing so. In my view, this conclusion is belied by the video evidence. Two average-sized male police officers could undoubtedly have helped the driver from his pickup truck unless he was resisting those efforts. Instead, the video tape shows the officers asking plaintiff to step out of his truck at least a dozen times. The tone of these requests gradually escalated from calm to insistent, and, finally, culminated in threats to use force (including a warning that they would tase him if he continued to resist). Rather than comply, plaintiff answered several times with "I'm fine." When they attempted to pull him from the truck, the video tape shows him clutching the steering wheel and bracing his legs (the brake lights flare as the officers try to pull him out of the truck). In short, plaintiff was actively and physically resisting.

The majority states that force is only justifiable in the face of "active resistance, some outward manifestation—either verbal or physical—on the part of the suspect [suggesting] volitional and conscious defiance." As just recounted, plaintiff showed just such defiance. Other than a few expletives used in the heat of the moment, the officers conducted themselves in a reasonable and

---

[1]Only in hindsight is this an unusual case because plaintiff was not intoxicated but experiencing hypoglycemia, the symptoms of which can mimic intoxication. *See, e.g.*, *Padula v. Leimbach*, 656 F.3d 595, 601 (7th Cir. 2011). In reviewing claims for excessive force, a court must review the encounter based on what the officer saw without the benefit of hindsight. *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 95 (6th Cir. 2012).

professional manner. I am unable to discern anything remotely resembling a violation of plaintiff's constitutional rights.

Unfortunately, the majority's opinion offers little guidance to officers confronting a similar situation in the future. Given the failed efforts initially to remove plaintiff from the truck, what should have happened next? The officers had immobilized the truck; should they have left him in it and waited for him to sober up (based on their reasonable assumption that he was under the influence of drugs or alcohol)? Ironically, such a strategy could have resulted in permanent brain damage or even death had plaintiff's low blood sugar persisted or worsened. *See* Philip E. Cryer, *Hypoglycemia, Functional Brain Failure, and Brain Death*, 117 J. Clinical Investigation 868, 868-69 (2007), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1838950/.

Instead, the officers deployed their Taser and it worked as designed. After the shock, plaintiff immediately came out of the truck and, though it took both officers, they quickly gained control of him without injury to anyone. Plaintiff continued to resist as the officers struggled to handcuff him, and they ultimately abandoned efforts to get his wrists in position to be cuffed, instead fastening two sets of cuffs together to increase the length.[2] The moment he was fully immobilized and cuffed, the officers respectfully helped plaintiff, whom they referred to as "sir," get to his feet and sat him on the front of their cruiser. When they discovered plaintiff's insulin pump, they immediately summoned medical personnel who promptly treated his hypoglycemia. If the majority insists that

---

[2] Interestingly, some of the cases cited by the majority suggest that if the officers had tased plaintiff for resisting being handcuffed, such a use of force would have been constitutionally permissible. *See, e.g.*, *Caie*, 485 F. App'x 92 at 96; *Williams v. Sandel*, 433 F. App'x 353, 361 (6th Cir. 2011); *Williams v. Ingham*, 373 F. App'x 542, 548 (6th Cir. 2010).

this response constituted a constitutional violation, it would be helpful to provide some guidance to future officers confronting similar situations.

To illustrate how far the majority has reached here, it is instructive to dig a little deeper into the cases referenced by the majority as comparable precedents where officers used excessive force against suspects offering no resistance.

For example, in *Kijowski v. City of Niles*, 372 F. App'x 595 (6th Cir. 2010), Kijowski was a wedding guest sitting in his truck talking on his phone, and not disobeying police commands. *Id.* at 600-01. Officers dragged him from his truck, smashed his phone, and tased and kicked him. *Id.* at 597. In *Landis v. Baker*, 297 F. App'x 453 (6th Cir. 2008), officers used excessive force in tasing a suspect pinned to the ground, with officers on his back forcing his head under muddy water. *Id.* at 457-58. The suspect aspirated water, mud, and leaves, and ultimately died as a result of drowning. *Id.* at 458. In *Roberts v. Mangold*, 240 F. App'x 675 (6th Cir. 2007), an officer used excessive force in tasing a suspect repeatedly after the suspect was "completely pinned" on the ground. *Id.* at 676. Lastly, in a case about pepper spray rather than a Taser, officers used excessive force when they doused a suspect in pepper spray and applied asphyxiating pressure after he was fully immobilized with handcuffs and leg shackles, and had stopped resisting. *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 897 (6th Cir. 2004). The suspect subsequently died from cardiac arrest. *Id.* at 898.

In my view, these cases are all factually distinguishable from the conduct of the officers here. To suggest that this line of cases put the officers on notice that their use of force against plaintiff would violate his clearly established constitutional rights is simply untenable.

No. 12-1500
*Eldridge v. City of Warren et al.*

For these reasons, I would **REVERSE** the district court's denial of the defendants' motion for summary judgment based on qualified immunity.