CLAY, Circuit Judge,
dissenting.
The majority suggests that Plaintiff Michael Reed fails “to ‘go beyond the pleadings’ and identify admissible evidence of the essential elements of his claim,” see Majority at 136 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); I strongly disagree. Reed’s allegations are supported by convincing evidence: the video recording of the events that transpired in Reed’s jail cell and depositions in which the officers admit to thrice tasing a nonviolent individual in the immediate aftermath of a seizure. To bolster its argument that Reed’s claim rests solely on the pleadings, the majority seems to suggest that Reed submitted “only” one sentence in response to Defendants’ motion for summary judgment and failed to cite to any evidence in the record. See Majority at 135-36. This is misleading; Reed’s response to Defendants’ motion for summary judgment was eighteen pages long, and referred repeatedly to the video recording in the record. Because the majority, like the district court below, misapplies the holding of Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), and by doing so usurps the role of the jury, I respectfully dissent.
I.
My disagreement begins with the majority’s narration of the facts 'in this case. The evidence in the record, including the video, establishes the facts as follows:
As the result of an accident that caused a traumatic brain injury many years ago, Reed suffers from both tonic clonic seizures (stiffening and rigidity of muscles followed by rhythmic jerking motions) and complex partial seizures (the person appears to stare blankly and loses contact with his surroundings, often followed by chewing movements, mumbling, and unorganized movements). Like many who suffer from seizures, Reed usually does not recall having the seizure and becomes confused, disoriented, and fatigued in the aftermath.
In August 2008, Reed had a seizure while walking on the street. Emergency medical technicians (“EMTs”) responded to the scene, and Reed allegedly became aggressive and assaultive when an EMT rapidly approached him to try to take him to the hospital. Instead of receiving medical attention, Reed was charged with assaulting a peace officer and taken to jail at the Franklin County Corrections Center II (“FCCCII”).
On December 23, 2008, Judge Michael Holbrook of the Franklin County Common Pleas Court found Reed not guilty by reason of insanity (“NGRI”) and ordered Reed to be committed to the Twin Valley Behavioral Healthcare Forensic Unit. However, due to overcrowding at the behavioral healthcare facility, Reed had to stay at FCCCII until a bed became available at Twin Valley. Although the court recognized that Reed did not belong at FCCCII due to his mental health and medical conditions, Reed was nevertheless sent to FCCCII, where he was treated as a prisoner.
On January 29, 2009, Reed had a seizure in his jail cell in FCCCII. Deputy James Jodrey called a “code blue medical,” which signals that an inmate requires medical attention. See Att. Internal Affairs Report 09-048, Jodrey Statement, ECF No. 163-1. Corporal Sam Byrd and Deputies Sam Montrose, James Jodrey, Clayton Kern and Chris Starner (collectively, “offi *140 cers”) entered Reed’s jail cell in response to the code blue. They were all aware that Reed had just had a seizure, and that they were to assist in transporting Reed to the hospital for medical treatment. Id. All of the officers were also aware that Reed gets disoriented and confused immediately following a seizure, and that Reed was not in a state to understand or obey -their commands. See Att. Internal Affairs Report 09-048, ECF No. 163-1.
Reed was on the floor of his cell when the five officers entered. Reed was dazed, confused, and clearly disoriented. See Video at 00:00:00-00:00:29, ECF No. 160. For ten seconds, the five officers shouted rapid commands at Reed, demanding that Reed put his hands behind his back so that the officers could handcuff him. Id. at 00:00:01-00:00:12. It is clear from the video, and should have been obvious to the officers, that Reed did not understand a single word that the officers said. Reed sat motionless on the floor with his hands up in “surrender” position and stared blankly at the five uniformed men in his cell. Id.
Although Reed did not put either of his hands behind his back, the officers attempted to handcuff him anyway. Id. at 00:00:13. Reed did not resist when one officer tried to put a handcuff on Reed’s left wrist; in fact, Reed barely moved, and the officer secured Reed’s left wrist without incident. Id. at 00:00:14-00:00:23. Reed did not respond to the officers’ commands for him to put his right hand behind his back. Id. at 00:00:23-00:00:29. Reed sat with his hands in front of him, apparently unaware of what was going on in his post-seizure state. Id. One officer asked, “Has he not been taking his meds?” Id. at 00:00:24.[1] Another officer tried to grab Reed’s right wrist and pull it behind his body to handcuff him, and Reed lightly moved his arm forward. Id. at 00:00:26-0:34. When the officer again tried to pull Reed’s arm behind his back, Reed moved his arm and held it across his stomach and started to lie back down on the floor. Id. at 00:00:34-00:00:38. The left handcuff was attached to Reed’s left wrist, and the right handcuff was. open. The officers told Reed to sit up, and one deputy pushed him upright so that Reed was sitting on the floor, hunched over, with his hands folded in his lap. Id. at 00:00:40. The officers did not attempt to attach the open handcuff to Reed’s right wrist when both of Reed’s hands were in front of his body. Instead, two officers grabbed Reed’s arms and attempted to pull Reed’s hands behind his back. Id. at 00:00:43-00:00:46. Reed then twisted his torso to the left, falling onto his stomach. Id. at 00:00:46-00:00:49. Much of the scene is not captured on the video, but approximately three seconds later, it appears that Reed rolled onto his back and began groaning/shouting “Ahhh! Ahh! Ahhh!” Id. at 00:00:48-00:00:52. All five officers stood over Reed, shouting various commands.
At the 52-second mark of the video, we see clearly a red light — the laser used to aim the X26 taser gun — projected onto Reed’s chest. As Reed lay on his back on the floor of his jail cell with his hands across his chest, the officers began shouting at Reed that he was “going to get tased” and “it [was] gonna fucking hurt bad.” Id. at 00:00:52-00:01:07. Reed continued to lie on the floor without speaking or making any threatening gestures. Id. at 00:00:52-00:01:07.. The officers shouted at Reed and made one unsuccessful attempt to pry Reed’s hands apart. Id. at 00:01:12-00:01:17. Again the officers did not attempt to secure the open handcuff, *141 which they could have done by attaching it to Reed’s right hand when both of Reed’s hands were in front of his body. Within seconds, Byrd deployed the taser gun, delivering electric shocks through Reed’s body for about ten seconds. Id. at 00:01:17-00:01:27. Reed began convulsing on the floor.
After Byrd tased Reed for the first time, Reed sat still with his hands up in “surrender” position, and he begged groggily, “please, please, please.” Id. at 00:01:29-00:01:38. He appeared startled. The officers continued yelling but Reed stared blankly at them. Id. In the video, the laser of the taser gun is visible on Reed’s chest. From 00:01:40-00:01:49, the camera was blocked by various officers standing in front of the lens, so we .cannot see precisely what occurred. It appears from the video that Reed kept his hands up in front of his body in “surrender” position. Byrd continued shouting at Reed, as Reed continued to beg “please, please, please,” and Byrd deployed his taser gun for a second time. Id. at 00:01:49. It appears from the video that Reed was then lying on the floor and groaning loudly. We can infer from the audio that the officers were aware that Reed was nearly unconscious because one of them told Reed to ‘Wake up!” Id. at 00:02:03, before asking “Do you want to get shocked again? Say no! Say no!” Id. at 00:02:08.
The deputies then handcuffed Reed behind his back. Id. at 00:02:12-00:02:27. With Reed in handcuffs, one officer commanded Reed to “roll over!” and Reed obliged. Id. at 00:02:32. All four deputies were crouched over Reed as he laid face down on the floor with his hands cuffed behind his back. Id. at 00:02:43-00:02:49. The scene is mostly obscured by officers standing in front of his video camera, but it appears that the officers secured Reed’s legs with leg irons. Id. at 00:03:50-00:04:08.
Even after Reed was completely restrained in handcuffs and leg irons and laying motionlessly on the cell floor, the officers continued to threaten Reed with the taser gun. Id. at 00:04:30 (“Are you gonna stand up now? Am I gonna have to tase you again?”). After the deputies pulled Reed to his feet and walked him down the hall to get medical treatment for a bleeding laceration on his forehead, Reed began to ask in a dazed voice, “What did I do? What did I do?” Id. at 00:06:20. Even after Reed was sitting calmly in the holding cell with his hands cuffed behind his back and his feet secured in leg irons, one of the deputies threatened him: “Don’t move. I don’t want to have to tase you again.” Id. at 00:07:08.
Deputies Christopher Dishong and Matthew Carter later transported Reed to the Mount Carmel Hospital West Emergency Room for further examination and treatment of the lesion on his forehead. Dish-ong testified that after Reed received stitches for the cut on his head, Reed was sent to a section of the general emergency room area. The deputies attached “leg irons” which connected Reed to the hospital stretcher. According to Dishong’s report, Carter left the room to go to the bathroom, and Reed squatted on the hospital bed and began to mutter under his breath. There is no video of this incident, but Dishong claims that he ordered Reed to lie back down on the bed and warned Reed that he would be tased. Reed did not comply, and allegedly “lunged” at Dishong (while Reed was still shackled to the bed); Dishong then tased him. As a result, Reed fell off the bed, struck his head on the wall and floor, and sustained another head laceration, which required stitches.
*142 Use of an X26 taser gun causes “neuro-muscular interruption,” which renders the subject unable to move and may cause him to fall. See Exhibit Declaration and Policies, ECF No. 6-1. People tased are especially at risk of injury if they are in a position where they could fall and suffer an impact injury to the head, are on an elevated or unstable surface, or are in restraints that incapacitate or immobilize them. Id.
According to the Franklin County Sheriffs Office policy (“the Jail Policy”), Taser guns are to be deployed “to gain control of a violent or dangerous inmate when attempts to subdue the inmate by conventional tactics have been or are likely to be ineffective or there is reasonable expectation that it will be unsafe for deputies to approach within contact range of the inmate.” See Exhibit Declaration and Policies, ECF No. 6-1. The Jail Policy permits taser deployment in the following circumstances: self-defense; protection of another inmate or staff; disarming an inmate under non-lethal conditions;- preventing self-harm to an inmate; or controlling a combative inmate. Id. The Jail Policy specifically states that Tasers should not be deployed upon persons who are restrained by a mechanical device such as handcuffs, leg irons, or a restraint chair. Id.
II.
We review de novo the district court’s grant of summary judgment. Longaber-ger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir.2009). Summary judgment is proper “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [Defendants are] entitled to a judgment as a matter of law.” Fed. R.Civ.P. 56(c); see also Celotex, 477 U.S. at 323, 106 S.Ct. 2548. A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for Reed. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). We determine simply “whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that [Defendants] must prevail as a matter of law.” Id. at 243, 106 S.Ct. 2505. We must not weigh the evidence or make credibility determinations. Id. at 249, 106 S.Ct. 2505; Champion v. Outlook Nashville, Inc., 380 F.3d 893, 900 (6th Cir.2004). Thus, “the inquiry performed is the threshold inquiry of determining whether there is a need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.” Anderson, 477 U.S. at 250, 106 S.Ct. 2505. If Reed’s account of the facts “does not require such a suspension of reality that no reasonable juror could accept it, that is enough to allow a jury to hear the claim.” Jones v. Garcia, 345 Fed.Appx. 987, 990 (6th Cir.2009). That he “may have a difficult time winning his case does not disable him from trying, at least so far as Rule 56 is concerned.” Id.; see also Kinzer v. Schuckmann, 850 F.Supp.2d 785, 794 (S.D.Ohio 2012) (denying summary judgment on the issue of qualified immunity even where “Plaintiffs excessive force claim ... is thin at best”).
In reviewing the district court’s grant of summary judgment, we must adopt Reed’s version of the facts. Scott, 550 U.S. at 378, 127 S.Ct. 1769 (for summary judgment “[i]n qualified immunity cases, [we usually adopt] ... the plaintiffs version of the facts”); see also Matsushita Elec. Indus. Co:, Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 *143 (1986) (we view the evidence and draw all inferences in the light most favorable to the nonmoving party); White v. Baxter Healthcare Corp., 533 F.3d 381, 390 (6th Cir.2008). There is an exception to this rule when the plaintiffs version of the facts is “blatantly contradicted by the record, so that no reasonable jury could believe it,” Id. at 380, but this exception is inapplicable to the case at hand.[2]
Although the video recording of the so-called “Cell Incident” accurately captures the events that transpired, it “neither proves nor disproves [Reed’s] claim” because the activity in the video is susceptible to more than one interpretation. Dixon v. County of Roscommon, 479 Fed.Appx. 680, 682 (6th Cir.2012). Though the majority suggests otherwise, Reed’s interpretation of the events on the video is by no means “blatantly contradicted” by the video evidence. This is especially true because much of the activity in the video occurred outside of the frame or was otherwise obscured. Unlike in Scott, where the video recording so discredited the plaintiffs version of events that no jury could have believed it, a reasonable jury could believe Reed after viewing the video in evidence. See Coble v. City of White House, 634 F.3d 865, 868-69 (6th Cir. 2011); Dixon, 479 Fed.Appx. at 682. Therefore, we must accept Reed’s interpretation of the video for the purposes of this appeal.
In addition, we “must disregard all evidence favorable to [Defendants] that the jury is not required to believe.” Champion, 380 F.3d at 900 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). In other words, “the court should give credence to the evidence favoring [Reed] as well as that evidence supporting [Defendants] that is uncontra-dicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.” Reeves, 530 U.S. at 151, 120 S.Ct. 2097. The district court should be affirmed “only if reasonable minds could not come to a conclusion other than one favoring [Defendants].” Id. (quoting Garrison v. Cassens Transp. Co, 334 F.3d 528, 537-38 (6th Cir.2003)).
Because I view the incidents of January 29, 2009 as a single event — a seizure followed by three tasings (two in the jail cell and one in the hospital) — I believe that Reed’s entire claim should proceed to a trier of fact. That there is no video recording of the so-called “Hospital Incident” is not dispositive where the essential facts are undisputed: Shortly after Reed had suffered a seizure and received medical treatment for a head laceration, Dish-ong deployed his taser gun on Reed while Reed was shackled to a hospital bed with leg irons. The trier of the facts is entitled to look at the event in context, and may determine that Dishong’s deposition testimony that Reed “lunged” .at him is not credible.
III.
1. Individual Capacity Claims

Constitutional Violation

I agree with the majority and the district court that Reed is entitled to constitu *144 tional protection under the Fourteenth Amendment. The test applied by the Supreme Court to determine whether governmental conduct violates an individual’s substantive due process rights is whether the alleged conduct “shocks the conscience.” Claybrook v. Birchwell, 199 F.3d 350, 359 (6th Cir.2000) (citing County of Sacramento v. Lewis, 523 U.S. 833, 848, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).[3] As the majority recognizes, we apply different standards of “conscience-shocking” depending on the circumstances in which the governmental action occurred. See Darrah v. City of Oak Park, 255 F.3d 301, 306 (6th Cir.2001) (citing Lewis, 523 U.S. at 850-51, 118 S.Ct. 1708). Where, as here, implicated government áctors “are afforded a reasonable opportunity to deliberate various alternatives prior to' electing a course of action ..., their actions will be deemed conscience-shocking if they were taken with ‘deliberate indifference’ towards the plaintiffs federally protected rights.” Claybrook, 199 F.3d at 359 (quoting Lewis, 523 U.S. at 852-53, 118 S.Ct. 1708).[4] I agree with the majority that “[t]he video recording in this case provides sufficient evidence for a jury to find that the situation in the cell afforded the deputies a reasonable opportunity” for deliberation. Majority at 135.
I therefore note that the district court applied an incorrect legal standard. The district court erroneously stated that “the defendant officers’ conduct violates [ ] Reed’s constitutional rights only if they tased him maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore- a safe environment.” Reed need not show that the deputies acted for the very purpose of causing him harm; only “in a rapidly evolving, fluid,-and dangerous predicament” would Reed need to show that -the officers had such nefarious intent. The law requires only that Reed cite evidence to support his allegation that the officers were deliberately indifferent to his right to be free from excessive force. To satisfy this low burden, Reed points to the video recording of five officers brutally tasing him for failing to comply with their rapid-fire commands a mere moment after he had suffered from a massive seizure. Reed has undoubtedly met his burden.
Furthermore, I disagree with the majority’s assertion that “there can be no dispute” that the so-called “Hospital Incident” was a “rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-re-sponse deliberation.” Majority at 138. The Supreme Court has applied a heightened standard in limited circumstances: namely a prison riot and a sudden high-speed automobile chase. See Whitley v. Albers, 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (prison riot is a rapidly evolving, fluid; and dangerous predicament); Lewis, 523 U.S. 833, 118 S.Ct. 1708 (1998) (high-speed automobile chase is a rapidly evolving, fluid, and dangerous predicament). Even under the facts alleged *145 in Dishong’s deposition, we can hardly say that the situation was a “rapidly evolving, fluid, and dangerous predicament” on-the same level as a prison riot or high-speed chase. When Reed squatted on the hospital bed and began to mutter, he was shackled to the hospital bed with leg irons; Dishong had time' to deliberate his course of action. Even if Reed did appear to “lunge” at Dishong, the situation presented limited danger, if any, to anyone other than Reed since Reed was physically restrained by the leg irons.
In concluding that Defendants did not violate Reed’s constitutional rights, the majority impermissibly relies on its own subjective interpretation of the video as well as Defendants’ one-sided account of the facts. This analysis is improper on summary judgment. In light of all of the evidence, including the video, a reasonable jury could undoubtedly find that the officers’ use of force shocks the conscience because it was taken with deliberate indifference toward Reed’s federally protected rights.
In applying the Fourteenth Amendment standard to the use of tasers, “courts have focused on [the individual’s] conduct when the taser was applied, the frequency and force with which it was applied, and the overall security needs of the institution.” Spears v. Cooper, No. l:07-CV-58, 2009 WL 838179 (E.D.Tenn. Mar. 30, 2009) rev’d in part sub nom. . Spears v. Ruth, 589 F.3d 249 (6th Cir.2009). With regard to the first factor, the evidence supports Reed’s allegation that Reed was not actively resisting the officers’ efforts to restrain him. Though Reed did not comply with the officers’ rapid-fire orders commanding him to put his hands behind his back, Reed’s noncompliance alone is insufficient to justify the officers’ use of force. See Harris v. City of Circleville, 583 F.3d 356, 361 (6th Cir.2009) (holding that an arrestee who did not comply with officer’s command to “kneel down” was not- resisting); El-dridge v. City of Warren, 533 Fed.Appx. 529, 533 (6th Cir.2013) (holding that a person who remained in his vehicle despite officers’ repeated commands for him to exit the vehicle was not actively resisting, and officers’ use of a Taser gun to subdue the person was “objectively unreasonable” and violated the Fourth Amendment). This Court has recognized an important distinction between noncompliance and “áctive resistance.” Id. at 535 (“noncompliance alone does not indicate active resistance; there must be something more”); Harris, 583 F.3d at 361 (“Other than not complying ... [plaintiff] was not doing anything to resist. [Plaintiff] does not appear to be resisting on the videotape.”).[5] Based on the evidence presented, a reasonable jury could conclude that Reed was merely noncompliant, and was not actively resisting. Since the video supports both parties’ proffered interpretations of Reed’s behavior, there is a genuine issue of fact regarding whether or not Reed was resisting. We must resolve this factual dispute in Reed’s favor for the purposes of our analysis of the issue on appeal.
The evidence also supports Reed’s allegation that Reed did not pose a substantial risk to the safety of himself, the officers, or third parties. The majority claims that Reed has not offered any evidence to contradict Defendants’ testimony that the open handcuff presented a substantial safety risk; I disagree. The majority fails to consider that the video itself casts doubt *146 on Defendants’ testimony, since it is clear in the video that the officers had ample opportunity to secure the open handcuff on Reed’s right hand in front of Reed’s body, and they did not do so. It was foreseeable that an individual in Reed’s disoriented state might reflexiyely pull his arms forward when an officer attempts to pull them behind his back, yet the officers nevertheless decided to handcuff Reed’s left wrist while Reed’s hands rested in front of his body and them tried to pull Reed’s hands behind his back.[6] If a loose handcuff presented such a threat to the officers’ safety, then the officers would have first positioned both of Reed’s hands behind his body before handcuffing one of Reed’s wrists. Alternatively, the officers could have waited until Reed “came to” before trying to handcuff him at all. Or, under the circumstances (having not done either of the above), the officers could have simply secured the loose handcuff by attaching the open handcuff to Reed’s right wrist in front of Reed’s body (which would have neutralized the purported safety risk). I raise these possible alternatives not because I believe that the deputies were constitutionally required to exhaust all possible alternatives before using a taser, but because the fact that the deputies passed up these opportunities casts doubt on the credibility of the officers’ professed belief that the open handcuff posed any substantial threat to their safety. While Reed could certainly benefit from expert testimony purporting to refute the testimony submitted by Defendants,- such testimony is not required for Reed to survive a motion for summary judgment where a reasonable interpretation of the video contradicts Defendants’ testimony. There is a genuine issue of material fact as to whether or not the open handcuff presented a substantial risk to the officers’ safety, and we must resolve this factual dispute in Reed’s favor for the purposes of our analysis of the issue on appeal.
The majority asserts that certain “facts” compel its conclusion that none of the deputies acted with deliberate indifference: namely, that,the officers tried to handcuff Reed “several times” before using the ta-ser and that the officers warned Reed that the taser would hurt. While I agree that these facts could support a jury’s decision that the officers’ conduct did not rise to the level of a constitutional violation, I strongly disagree that these facts compel such a conclusion. On the contrary, the video offers considerable support for the conclusion that the officers acted with deliberate ’indifference to Reed’s federally protected rights (or, alternatively, that the officers used excessive force that amounted to punishment). Specifically, the record shows that the officers were fully aware that Reed had just suffered from a serious seizure, and they were supposed to help him to get medical assistance; yet, within fifty-two seconds of entering the cell, Byrd was already preparing to use his taser gun on Reed. Adthough Reed was clearly dazed and discombobulated, the officers did not make any genuine effort to *147 help Reed snap back to alertness or wait until Reed was responsive before trying to handcuff him. Instead, not much more than one minute after Reed suffered a seizure, Byrd brutally subdued Reed with a taser gun. The video shows the officers treating Reed more like a dog than a human — commanding him to “sit up” and “roll over,” and punishing him at the first sign of non-obedience. Had Reed been in the hospital instead of a jail cell, there is no question that the officers’ behavior would be considered conscious-shocking.
I also disagree with the majority’s suggestion that “wait[ing] until Reed had fully recovered from the lingering effects of the seizure before taking him to the hospital for medical treatment” would have placed the officers “in an impossible Catch-22 situation: wait too long and risk being accused of the ‘unnecessary and wanton infliction of pain’ by their deliberate indifference to Reed’s serious medical needs, or act too quickly and risk being charged with ‘deliberate indifference toward the plaintiffs federally protected rights.’ ” Majority at 187. This alleged Catch-22 is a false dichotomy. There is a wide range of constitutionally acceptable behavior that neither involves excessive force nor unnecessary delay of access to medical treatment. The officers certainly could have waited more than fourteen seconds before approaching Reed to try to handcuff him while Reed was clearly discombobulated. Or they could have handcuffed Reed in front of his body, since it is foreseeable that an individual in Reed’s disoriented state might reflexively pull his arms forward when an officer attempts to pull them behind his back. Instead, the officers shouted rapid-fire commands at a virtually catatonic, non-threatening individual for twelve seconds before they approached him and tried to “wrestle” him into handcuffs, and prepared to shock him multiple times with a taser gun less than forty seconds later.
The majority emphasizes the number of times that the officers shouted commands and warnings, but their narration obscures the fact that this entire scene took place in a span of less than eighty seconds. For the first thirty seconds, Reed stared blankly into space while the officers shouted. Reed made no movement at all. Reed did not resist (arguably he did not even notice) when- the officers placed a handcuff on his left wrist while both of his hands were in front of his body, and Reed only began to pull forward when the officers tried to pull Reed’s right arm behind his back.
The record viewed in the light most favorable to Reed establishes that each of the officers knew that Reed had just suffered from a seizure, that Reed was not actively resisting, that Reed did not pose a threat to the officers, and that Reed was tased three times (twice in the cell, and once in the hospital). The record also supports the inference that Reed was not “violent or dangerous,” and that the officers’ use of the taser violated the Jail Policy. Although Reed has not offered expert testimony to refute Defendants’ testimony that the open handcuff presented a substantial threat to the officers’ safety, Reed can rely on the video to refute this notion, since the video clearly shows that the officers had ample opportunity to secure the open handcuff by cuffing Reed’s right wrist in front of his body, and they did not do so.
With regard to Dishong’s use of the taser, even if we accept as true Dishong’s testimony that Reed “lunged” at Dishong, the evidence viewed in the light most favorable to Reed shows that Reed was shackled to a hospital bed in the aftermath of a seizure and medical operation, and did not pose a substantial risk to Dishong. The evidence also supports the inference *148 that Dishong’s use of the taser violated the Jail Policy, which specifically states that tasers should not be deployed upon persons who are restrained by leg irons. Moreover, Dishong was aware that Reed was especially at risk of injury, since Reed was on an elevated, unstable surface (the hospital bed), in a position where he could fall and suffer an impact injury to the head (crouching), and was in restraints that immobilized him (leg irons).
A jury could reasonably conclude that the officers’ use of a taser gun on a nonthreatening, mentally ill individual in the immediate aftermath of a seizure shocks the conscience because it was taken with deliberate indifference toward Reed’s right to be free from excessive force. At the very least, the evidence presented raises an issue of material fact as to whether the officers’ behavior shocks the conscience, and summary judgment on the issue of qualified immunity was therefore improper.

Clearly Established Right

Each of the officers should have known that his behavior violated Reed’s constitutional rights. It is well established that the Due Process Clause of the Fourteenth Amendment protects individuals from- abusive government conduct that “shocks the conscience,” Lewis, 523 U.S. at 834, 118 S.Ct. 1708, and from excessive force that amounts to punishment, see Leary v. Livingston County, 528 F.3d 438, 443 (6th Cir.2008) (citing Graham v. Connor, 490 U.S. 386, 395 n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)), or “unnecessary and wanton infliction of pain,” Whitley, 475 U.S. at 320-21, 106 S.Ct. 1078.
In the context of the Fourth Amendment, we have previously recognized that “[officers should [know] that the gratuitous or excessive use of a taser violate[s] a clearly established constitutional right.” Landis v. Baker, 297 Fed.Appx. 453 (6th Cir.2008) (citing Hickey v. Reeder, 12 F.3d 754, 757 (8th Cir.1993) (“a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless” and its use without a legitimate reason might violate the Eighth Amendment)). In applying the Fourteenth Amendment standard specifically to the use of tasers, “courts have focused on detainees’ conduct when the taser was applied, the frequency and force with which it was applied, and the overall security needs of the institution.” Spears, 2009 WL 838179.
In the case at hand, the evidence viewed in the light most favorable to Reed establishes that Reed was not actively resisting, that Reed did not pose a threat to the officers, and that Reed was tased two times in his jail cell. Each, of the officers present in the cell was aware that Reed had a serious medical condition, and that he had just suffered from a seizure. Nevertheless, within eighty seconds of entering Reed’s cell in order to transport him to the hospital, Byrd decided to deploy his X26 taser gun, causing “neuromuscular interruption” and a great shock for the disoriented victim. Byrd did so in spite of the fact that .the Jail Policy instructed officers to deploy taser guns only for self-defense, protection of another inmate or staff, disarming an inmate under non-lethal conditions, preventing self-harm to an inmate, or controlling a combative inmate. The evidence, including the video, viewed in the light most favorable to Reed, establishes that Reed was not threatening, combative, or armed. Under these circumstances, a reasonable officer should have known that use of the taser would violate Reed’s due process rights.
Similarly, even if we accept as true Dishong’s testimony that Reed “lunged” at him, the evidence viewed in the light most favorable to Reed supports the conclusion *149 that Dishong’s decision to use the taser under the circumstances was made with deliberate indifference to Reed’s constitutionally protected rights.
In the instant case, Reed’s clearly established constitutional right is the right to be free from excessive force that “shocks the ' conscience.” In light of this right, it was objectively unreasonable for the officers to tase Reed repeatedly when he needed medical attention and was not actively resisting. Reed has submitted evidence in the form of deposition testimony and a video recording of part of the incident. After reviewing this evidence, I believe that it is sufficient to support Reed’s claim that Defendants’ actions were objectively unreasonable in light of clearly established law.
Additionally, “the fact that only [Byrd and Dishong] pulled the trigger on the taser does not absolve [the other officers] of liability.” Landis, 297 Fed.Appx. at 464 (citing Bruner v. Dunaway, 684 F.2d 422, 426 (6th Cir.1982) (“it is not necessary, in order to hold a police officer liable under [§ ] 1983, to demonstrate that the officer actively participated in [using force against] a plaintiff’)). There is evidence that the other officers encouraged the use of the taser and made no attempt to thwart the use of the taser on Reed. A reasonable jury could conclude that the other officers “had the means and opportunity to prevent the harm” to Reed, and that their failure to do so was conscience-shocking.
2. Remaining Claims
The district court dismissed Reed’s remaining claims — Reed’s claims against the officers in their official capacities as well as his claims against Franklin County, which rely on Monell v. Dep’t of Soc. Servs. of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)— based on its conclusion that Reed did not suffer a violation of his Fourteenth Amendment rights. For the reasons, discussed supra, I believe-that Reed has stated a constitutional violation, and so dismissal of these claims, pn this ground was erroneous.
IV.
For the foregoing reasons, I disagree with the -majority, and would reverse the order of the district court and remand the case for further proceedings consistent with this opinion.

. Later, another one of the officers asks Reed twice, "Reed,- have you been taking your meds?" See Video at 00:06:08-00:06:12, ECF No. 170.

. The majority quotes Coble for the proposition that “there is nothing in the Scott analysis that suggests that it should be restricted to cases involving videotapes.” Majority at 132-33 (quoting Coble v. City of White House, 634 F.3d 865, 868-69 (6th Cir.2011) (internal quotation marks omitted)). In Coble, we considered whether the exception articulated in Scott would apply to an unambiguous audio recording that blatantly contradicted the plaintiff’s version of the facts, and concluded that it would. This Court has never indicated that the holding of Scott extends beyond an unambiguous recording of the events in dispute.

. The Supreme Court has also recognized that conduct that meets the deliberate indifference standard of the Eighth Amendment would violate the Fourteenth Amendment, since the protections afforded under the Fourteenth Amendment are at least as great as those under the Eighth Amendment. City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (citing Bell v. Wolfish, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)); see also Lewis, 523 U.S. at 850, 118 S.Ct. 1708.

. This Court has also recognized that the Fourteenth Amendment, "[a]t the very least ... protects a[n individual] from the use of excessive force that amounts to punishment,’ ” Lanman v. Hinson, 529 F.3d 673, 680 (6th Cir.2008) (quoting Phelps v. Coy, 286 F.3d 295, 300 (6th Cir.2002)).

. Eldridge is not the only case in this Circuit to recognize a distinction between active resistance and noncompliance. Though the majority may believe that Reed's case “is not a reprise of Harris v. City of Circleville," Majority at 137,- it cannot deny that Harris recognizes a distinction between resistance and noncompliance.

. The majority mischaracterizes the argument of the dissent. See Majority at 135-36. The dissent does not suggest that the fact that Reed's movement was unintentional automatically renders the officers’ conduct conscious-shocking. To the contrary, I agree with the majority that the constitutional inquiry centers on the deputies' intent, and not Reed's intent. However, for the reasons I have explained above, the fact that Reed's movement was reflexive and foreseeable is relevant to our inquiry regarding the deputies’ intent. I question the deputies' intent — and the integrity of their belief that the open handcuff was "a major danger” that could have been used as a deadly weapon — where the video clearly shows that the officers passed up several opportunities to prevent, or at least neutralize, the "dangerous situation” presented by an open handcuff.