*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0028p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

ROBERT SHREVE et al.,

*Plaintiffs*,

MICHAEL REED, Individually,

*Plaintiff-Appellant*,

*v.*

FRANKLIN COUNTY, OHIO et al.,

*Defendants-Appellees.*

No. 13-3119

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:10-cv-00644; 2:11-cv-00261; 2:11-cv-00415; 2:12-cv-00070.
Edmund A. Sargus, Jr., District Judge.

Decided and Filed: February 6, 2014

Before: BOGGS, CLAY, and GILMAN, Circuit Judges.
_____

## COUNSEL
_____

**ON BRIEF:** Noure Alo, HARRISON ALO, ATTORNEYS AT LAW, Columbus, Ohio, for Appellant. Mary Jane Martin, FRANKLIN COUNTY, OHIO PROSECUTOR'S OFFICE, Columbus, Ohio, for Appellees.

GILMAN, J., delivered the opinion of the court, in which BOGGS, J., joined. CLAY, J. (pp. 18–34), delivered a separate dissenting opinion.
_____

## OPINION
_____

RONALD LEE GILMAN, Circuit Judge. This case arises out of a putative class action against Franklin County, Ohio, its sheriff Zachary Scott, and 14 of the sheriff's deputies for allegedly using excessive force against detainees in the county jail and for violating the privacy of detainees through strip searches. Settlements were reached with

1

all the plaintiffs other than Michael Reed, leaving Reed as the only detainee whose claims are presently before us. Reed alleges that the deputies used excessive force against him, in violation of the Eighth and Fourteenth Amendments to the United States Constitution, when they subdued him with a Taser while he was in custody. He also argues that the county failed to train the deputies on the proper use of Tasers, thereby creating a policy and practice of abuse.

The defendants moved for summary judgment, with the individual defendants claiming qualified immunity and all defendants denying any constitutional violation. After determining that "no rational fact finder could conclude that the defendant deputies acted with conscience-shocking malice or sadism towards Mr. Reed during either the Cell Incident or the Hospital Incident," the district court granted the defendants' motion. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

### A. Factual background

Reed's claims arise out of two incidents that both occurred on January 29, 2009. In the first incident (the Cell Incident), which took place inside Reed's cell at the Franklin County Corrections Center II (FCCC II), the sheriff's deputies were unable to handcuff Reed due to his resistance and twice used a Taser to subdue him. The second incident (the Hospital Incident) occurred later that day at the Mount Carmel West Hospital Emergency Room. There, a deputy used a Taser on Reed after Reed lunged at the deputy.

### 1.      *The Cell Incident*

The genesis of the events leading to Reed's detention began in the early 1990s when Reed was involved in a motorcycle accident. As a result of the accident, Reed suffers from seizures. In August 2008, Reed had a seizure while walking down the street in Columbus, Ohio. Emergency personnel arrived and tried to take Reed to the hospital, but Reed violently resisted. Reed was taken into custody and charged with assaulting a peace officer.

The Franklin County Common Pleas Court found Reed not guilty by reason of insanity in December 2008 and ordered him committed to the Twin Valley Behavioral Healthcare Forensic Unit.  But because the Twin Valley facility did not have space for Reed, he was still at FCCC II in January 2009.

On January 29, 2009, Reed suffered a seizure in his cell.  Several sheriff's deputies entered the cell and attempted to handcuff Reed in order to transport him to a nearby hospital for medical treatment.  In their efforts to handcuff Reed, the deputies used a Taser on him twice.  The entire incident is captured on video.  Neither party contests the video's admissibility or its completeness in portraying the relevant events.  Instead, the parties dispute whether the video shows that the deputies violated Reed's constitutional rights by using excessive force.

The video shows Reed sitting on the floor of his cell, apparently disoriented, with his hands raised and a cut above his left eye.  As the recording begins, the deputies tell Reed four times to "Put your hands behind you."  The deputies explain to Reed that they are "going to put some cuffs on you for your safety and ours."  Reed then lowers his hands slightly, and a deputy takes Reed's left hand, moves it behind Reed's back, and places one of the handcuffs on that hand.

But as the deputy tries to take Reed's right hand and attach it to the other handcuff, Reed pulls the hand back and holds it across his chest.  Deputies then coax Reed to sit up, but Reed twists to his left, leans back, and begins groaning.  While this is taking place, the deputies tell Reed four more times to put his hands behind his back.  Now lying on the floor on his back, Reed again grasps the cuff on his left hand with his right.  Twice more the deputies tell Reed to put his hands behind his back.  They also tell Reed that he is "going to get Tased" if he does not cooperate and, four times, that it will hurt.  The deputies then tell him three more times to "let go of the cuff."  At the same time, a deputy again tries to pull Reed's hands apart and finish handcuffing him.

During this time, the deputies were aware that Reed's loose handcuff posed a threat to their physical safety.  One stated that he considered the loose handcuff "a major danger."  Another said that the open handcuff presented a "sharp [and] jagged edge" and

that people had been killed from open handcuffs used as a weapon. This deputy had been trained never to lose control of an inmate with a loose handcuff.

Unsuccessful in all their efforts, the deputies step back from Reed and a different deputy volunteers to "get his cuff." Two deputies try to pry Reed's hands apart, but are unable to do so. Reed then crawls towards the officers, at which point a deputy uses a Taser on Reed. Reed falls onto his back and begins groaning and shaking in pain. A deputy then instructs Reed, "Don't fight anymore."

Recovering from the shock, Reed reaches towards the deputies and says "OK, OK, OK." Reed again raises his hands in the air. The deputies instruct Reed "put your hands behind your back" eight times. But Reed mumbles something unintelligible and then says "please." Reed continues to hold his hands in front of him and says "please, please, please, please." Three deputies again attempt to grab Reed's hands and secure the right handcuff on him, but are unsuccessful.

A deputy then uses the Taser on Reed a second time. Reed is told that they need to handcuff him so that they can take him out of the cell for medical treatment. One asks him "Do you want to get shocked again? Say no. Say no." Even after using a Taser twice, three deputies struggled to get the handcuff on Reed's right hand. Approximately two minutes after entering the cell, the deputies were finally able to secure the handcuff.

Reed continued to thrash about, even with both hands handcuffed behind his back. After five deputies held Reed down and made three further commands to "stop resisting," the deputies finally managed to subdue Reed's thrashing on the cell floor. The deputies were then able to secure leg irons on Reed and walk him out of his cell.

### 2.    *The Hospital Incident*

According to the deposition testimony of Deputy James Dishong, he and Deputy Matthew Carter drove Reed to Mount Carmel West Hospital after Reed was secured. Deputy Dishong's account of what happened at the hospital is uncontested in the record; no other depositions or record evidence speak to the incident.

Dishong testified that he and Carter took Reed to the hospital and eventually into a small examination space bordered by a wall and curtains where Reed was seen by a nurse practitioner. In the examination space, Dishong removed Reed's handcuffs and used them to attach Reed's leg irons to the bed rail, giving Reed approximately a five-foot radius of movement. The examination itself took place without incident.

Dishong, Carter, and Reed were waiting for the paperwork to be completed when Carter stepped out to use the restroom. As soon as Carter was gone, Reed turned to his left and began muttering. Dishong asked Reed if everything was all right. Reed continued muttering and squatted on the bed. Dishong told Reed to "lay back down," but Reed did not heed Dishong's command. He instead asked Dishong: "Do you want a piece of me?"

Dishong again instructed Reed to "lay back" or he would "have to be forced to tase you." At that point Reed lunged toward Dishong with his hands raised. Dishong Tased him, the probes striking Reed's right shoulder and left leg. Reed struck the wall and fell to the floor.

## B.  Procedural background

In September 2012, the defendants moved for summary judgment on Reed's individual claims. Reed timely responded, but did not file any affidavits or additional proof in support of his Brief in Opposition. The district court granted summary judgment for all the defendants. Canvassing the record, the court found no evidence that they had acted with the requisite intent—"maliciously and sadistically for the very purpose of causing harm"—to violate Reed's Fourteenth Amendment rights. *See Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) (setting forth the standard for liability under the Fourteenth Amendment).

Reed argues on appeal that the district court erred because it "relied on the Defendant's [sic] narration of facts" and thus "failed to view the facts in the light most favorable to the non[-]moving party." His brief offers an alternative narration of the facts, relying on the video and his Second Amended Complaint. He claims that the

"officers could have handcuffed Mr. Reed without the use of a Taser. Their utilization of the Taser in this instance was a clear violation of department policy relating to the usage of Tasers." The defendants respond that the district court correctly determined that Reed identified no genuine dispute of material fact, that Reed's claims arise under the Fourteenth Amendment, and that the court correctly found that Reed suffered no constitutional violation.

## II. LEGAL STANDARD

### A.  Operative pleading

Before we analyze the substance of Reed's appeal, one procedural point warrants clarification. Reed's brief filed in this court cites extensively to his Second Amended Complaint. But Reed's Third Amended Complaint superseded his Second Amended Complaint when the magistrate judge granted Reed's Motion to Amend the Complaint. *See* 61B Am. Jur. 2d Pleading § 789 ("An amended pleading that is complete in itself and does not refer to or adopt a former pleading as a part of it supersedes or supplants the former pleading."). Accordingly, any reliance that Reed places on his Second Amended Complaint is unavailing and should instead shift to his Third Amended Complaint. This matters little, however, because the evidence in the record, not the pleadings, governs whether a party has raised a genuine dispute of material fact sufficient to survive a motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B.  Summary judgment

"We review the district court's grant of summary judgment on qualified immunity grounds de novo." *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No genuine dispute of material fact exists where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Ultimately the court evaluates

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). The court must draw all reasonable inferences in favor of the nonmoving party. *Burgess*, 735 F.3d at 471.

A party asserting that a fact is genuinely disputed may not rely on the pleadings to establish that fact. Rule 56(c)(1) of the Federal Rules of Civil Procedure provides that

> [a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.

That is, a party must "go beyond the pleadings." *Celotex*, 477 U.S. at 324. "A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party." *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 270 (6th Cir. 2009) (emphasis added).

In *Scott v. Harris*, 550 U.S. 372 (2007), the Supreme Court addressed the role of video evidence at summary judgment. The Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

In that case, the plaintiff Harris claimed that the defendant police officer, Scott, used excessive force when he bumped Harris's speeding car with his police cruiser, ultimately rendering Harris a quadriplegic. *Id.* at 375. Harris contended that when Scott rammed his car, Harris was in full control and that the roads ahead were clear, so that the jury could have found Scott's use of force excessive. *Id.* at 375–76. The Supreme Court disagreed, observing that "[f]ar from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury." *Id.* at 380. Accordingly, the Court determined that

Harris's "version of events is so utterly discredited by the record that no reasonable jury could have believed him." *Id.* It thus held that the lower courts "should have viewed the facts in the light depicted by the videotape." *Id.* at 381.

*Scott*'s holding is twofold. First, *Scott* stands for the proposition that witness accounts seeking to contradict an unambiguous video recording do not create a triable issue. *Id.* at 380-81. Second, *Scott* reaffirmed the holdings of *Matsushita* and *Anderson* that, in disposing of a motion for summary judgment, a court need draw only *reasonable* inferences in favor of the nonmoving party; it need not construe the record "in such a manner that is wholly unsupportable—in the view of any reasonable jury—by the video recording." *Marvin v. City of Taylor*, 509 F.3d 234, 239 (6th Cir. 2007); *see also Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (holding that the court should "view[] the facts in the light depicted by the videotape," and that "[t]he central issue is whether the evidence . . . is so one-sided that one party must prevail as a matter of law") (internal quotation marks omitted). This court has also clarified that there is "nothing in the *Scott* analysis that suggests that it should be restricted to cases involving videotapes." *Coble v. City of White House*, 634 F.3d 865, 868–69 (6th Cir. 2011).

## III.  RELEVANT CONSTITUTIONAL STANDARD

### A.  Substantive basis for Reed's claims

Before analyzing the evidence in this case, we first address the substantive basis for Reed's claims. Reed pleaded his claims under 42 U.S.C. § 1983. Section 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

Reed claims that the deputies violated his rights under either the Eighth or Fourteenth Amendments to the United States Constitution.

Typically, the Fourteenth Amendment's Due Process Clause protects pretrial detainees from excessive force that amounts to punishment, *Leary v. Livingston Cnty.*, 528 F.3d 438, 443 (6th Cir. 2008), and the Eighth Amendment protects convicted prisoners from "unnecessary and wanton infliction of pain," *Graham v. Connor*, 490 U.S. 386, 398 n.11 (1989) (internal quotation marks omitted). The district court determined that Reed's situation—awaiting transfer to a mental-health facility after being found not guilty by reason of insanity—"d[id] not fit squarely into any of these categories." But citing this court's decision in *Lanman v. Hinson*, 529 F.3d 673, 680–81 (6th Cir. 2008), the district court held that the Fourteenth Amendment applied to Reed.

> *Lanman* clarified that
>
> [i]f the plaintiff was a convicted prisoner at the time of the incident, then the Eighth Amendment deliberate indifference standard sets the standard for an excessive force claim. But if the plaintiff was a free person, and the use of force occurred in the course of an arrest or other seizure, then the plaintiff's claim arises under the Fourth Amendment and its reasonableness standard.

*Id*. at 680 (citations omitted). Of particular significance for the present case is *Lamman*'s insight that "[t]he Fourteenth Amendment is the source of a pretrial detainee's excessive force claim because when a plaintiff is not in a situation where his rights are governed by the particular provisions of the Fourth or Eighth Amendments, the more generally applicable Due Process Clause of the Fourteenth Amendment provides the individual with protection against physical abuse by officials." *Id.* at 680–81. But "[n]otwithstanding the Due Process Clause's broader applicability, we remain cognizant of the fact that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Burgess v. Fischer*, 735 F.3d 462, 473 (6th Cir. 2013) (internal quotation marks omitted).

The difference is this: An excessive-force claim under the Eighth Amendment requires that the plaintiff show that force was not "applied in a good-faith effort to

maintain or restore discipline," but instead applied "maliciously and sadistically to cause harm." *See Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995). But an excessive-force claim under the Fourteenth Amendment operates on a sliding scale. Generally, to constitute a Fourteenth Amendment violation, an official's conduct must "shock[] the conscience." *Burgess*, 735 F.3d at 473.

When officials respond to "a rapidly evolving, fluid, and dangerous predicament," *id.* (internal quotation marks omitted), the Fourteenth Amendment's excessive-force standard is the same as the Eighth Amendment's: "[T]he plaintiff must show that the defendant acted maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline." *Id.* (internal quotation marks omitted). But "[w]here defendants are afforded a reasonable opportunity to deliberate . . . [,] their actions will be deemed conscience-shocking if they were taken with deliberate indifference towards the plaintiff's federally protected rights." *Id.* (alteration in original) (internal quotation marks omitted).

This state of culpability is clearly set out in *Darrah v. City of Oak Park*, 255 F.3d 301 (6th Cir. 2001):

> [I]n situations where the implicated government actors are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action . . . , their actions will be deemed conscience-shocking if they were taken with deliberate indifference towards the plaintiff's federally protected rights. In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation . . . , public servants' reflexive actions shock the conscience only if they involved force employed maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline.

*Id.* at 306 (alteration in original) (internal quotation marks omitted); *see also Burgess*, 735 F.3d at 473 (same). We will therefore evaluate this case according to the *Darrah* standard. *Accord Youngberg v. Romero*, 457 U.S. 307, 314 (1982) (considering "the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment to the Constitution"); *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 848 (6th Cir. 2002) (holding that "[t]he involuntarily committed

have greater rights regarding confinement under the Fourteenth Amendment than criminals are due under the Eighth Amendment").

## B.  Qualified immunity

Also at play in this case is the doctrine of qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, No. 134 S. Ct. 3, 4 (2013) (internal quotation marks omitted).  "Once raised, it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity." *Burgess*, 735 F.3d at 472.  In the Sixth Circuit we have generally "use[d] a two-step analysis: (1) viewing the facts in the light most favorable to the plaintiff, we determine whether the allegations give rise to a constitutional violation; and (2) we assess whether the right was clearly established at the time of the incident." *Id.*  Because we resolve the present case by affirming the determination that no constitutional violation occurred, we need not address whether the alleged right was clearly established.  *See id.* ("We can consider these steps in any order.").

## IV.  CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

## A.  The Cell Incident

The video recording in this case provides sufficient evidence for a jury to find that the situation in the cell afforded the deputies "a reasonable opportunity to deliberate various alternatives prior to electing a course of action." *Darrah*, 255 F.3d at 306 (internal quotation marks omitted).  Reed was warned multiple times that he was "going to get Tased" if he did not cooperate and that it would hurt.  The deputies also tried to wrestle him to the ground to cuff him several times before the first use of the Taser. After each attempt, they backed away.  And, at one point, a deputy volunteered to "get his cuff" and other deputies assisted him.  These are the kinds of statements that would permit a jury to infer that the deputies had an opportunity to deliberate before taking the actions that they did.  *See McKenna v. Edgell*, 617 F.3d 432, 441 (6th Cir. 2010) ("[W]e

ask the *jury* to determine whether a set of facts amounted to exigent circumstances.") (emphasis in original).

But these same facts also compel the conclusion that the deputies did not act with "deliberate indifference towards [Reed's] federally protected rights." *Darrah*, 255 F.3d at 306 (internal quotation marks omitted). That they tried to handcuff him several times before using the Taser shows that they sought to minimize the Taser's use. The deputies also warned Reed that the Taser would hurt and that he did not want to be Tased, which showed that they were trying to avoid unnecessary harm.

Another crucial factor is the uncontradicted testimony indicating that the deputies faced an ongoing danger with Reed thrashing about on the cell floor with a loose handcuff. The deputies had been trained never to lose control of an inmate with a loose handcuff because they knew that it could be used as a weapon. Under these circumstances, even if Reed was suffering from a seizure and unable to comprehend the deputies' statements, Reed could not establish an excessive-force claim under the Fourteenth Amendment when the deputies used a Taser to subdue him and secure the handcuffs.

Nothing in the record indicates that the deputies acted for any reason other than getting medical treatment for Reed following his seizure, a serious medical need to which indifference would likely have been a constitutional violation in itself. Reed in fact does not challenge the reasonableness of the deputies' decision to handcuff him—for their protection and his—prior to transporting him to the hospital. His challenge is instead limited to the use of the Taser. But we find no basis to hold that the deputies' use of a Taser after several failed attempts to wrestle the handcuffs onto Reed was "conscience shocking."

The dissent responds with the point that Reed's failure to comply was due to him acting "reflexively" (Dissent at p. 28), implying that Reed's actions might not have been intentional. Reed's intent is irrelevant, however, because the constitutional inquiry centers on the deputies' intent, not Reed's. *See Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (holding that the plaintiff "must demonstrate that *the state* acted

with the requisite culpability to establish a substantive due process violation under the Fourteenth Amendment") (internal quotation marks omitted) (emphasis added).  A jury would therefore not be entitled to find that the Tasing was done with deliberate indifference toward Reed's federally protected rights.  Summary judgment was thus proper on Reed's claims related to the Cell Incident.

Reed attempts to circumvent this conclusion through bare assertion.  In his response to the defendants' motion for summary judgment, Reed said only that "[i]t is clear from the videos and the facts and circumstances of the case that [the deputies] had an express intent to punish Mr. Reed."  This statement appears without any citation to the record, as does the entire recounting of events in Reed's Response.  But Rule 56(c) of the Federal Rules of Civil Procedure requires a party to "go beyond the pleadings" and identify admissible evidence of the essential elements of his claim.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Reed's complaint does not satisfy this standard for the simple reason that *pleadings are not evidence.  Compare* Fed. R. Civ. P. 8 (defining pleadings) *with* Fed. R. Evid. 401 (defining relevant evidence).

The dissent responds that "[i]n light of all of the evidence, including the video, a reasonable jury could undoubtedly find that the officers' use of force shocks the conscience because it was taken with deliberate indifference toward Reed's federally protected rights."  (Dissent at p. 27)  But Reed did not cite any materials supporting an inference that deputies acted with deliberate indifference, and the district court "need consider only the cited materials."  Fed. R. Civ. P. 56(c)(3).  The dissent cannot now attempt to salvage Reed's claims by providing record citations that Reed himself failed to present to the district court.

All of this leaves Reed with nothing more than the argument that we should infer deliberate indifference from the video recording.  But we have seen the recording.  It shows that three deputies tried three times to handcuff Reed before the first use of a Taser, and they were again unsuccessful before deploying the Taser a second time; it shows that they instructed him at least a dozen times to put his hands behind his back so that they could put handcuffs on him; it shows Reed flailing around with a loose

handcuff; and finally, it shows that they warned him four times that the Taser would hurt. The deputies' use of the Taser in this context may have been a miscalculation, but it does not "shock the conscience." *See Darrah*, 255 F.3d at 306.

In reaching the opposite conclusion, the dissent relies on an unpublished opinion from this court, *Eldridge v. City of Warren*, 533 F. App'x 529, 533 (6th Cir. 2013), to draw an illusory distinction between active resistance and mere noncompliance. The dissent contends that the video recording depicts the latter and that only active resistance can possibly justify the use of a Taser. This theory has numerous pitfalls. First, *Eldridge* is an unpublished opinion that "fails to provide any precedential guidance." *See United States v. Johnson*, 467 F.3d 559, 566 (6th Cir. 2006). This court has therefore *not* "recognized an important distinction between noncompliance and 'active resistance'" as claimed by our dissenting colleague. (Dissent at p. 28)

Second, even if *Eldridge* were good law, it is easily distinguishable from Reed's case. *Eldridge* concerned a suspected drunk driver who had driven his car into a "condominium complex, over a curb, and through patches of grass" before "eventually [coming] to a halt at a construction area, with further progress stifled by temporary construction barricades." 533 F. App'x at 530. Officers approached the driver and repeatedly ordered him out of his car. When the driver refused to comply, they removed the car keys and "tugg[ed]" on his arm in an attempt to remove his hands from the steering wheel. *Id.* at 530–31. The driver continued responding simply "I'm fine" to the officer's commands until one of the officers used a Taser. *Id* at 531. Under these circumstances, this court determined that the issue of excessive force was a question for the jury. *Id.* at 533.

The deputies here, in contrast, used the Taser only after multiple warnings and multiple attempts to wrestle Reed's arms behind his back. Moreover, the deputies testified that the loose handcuff on Reed's left hand could have been used as a weapon. Tasing a struggling detainee with a loose metal handcuff is simply not akin to Tasing a suspected drunk driver who was doing nothing more than declining to take his hands off the steering wheel.

One further point distinguishes *Eldridge*: *Eldridge* concerned the suspect's Fourth Amendment rights because the driver had not yet been arrested. *See id.* at 532. Under the Fourth Amendment, a court must determine whether the officers' conduct was "objectively reasonable." *See Graham v. Connor*, 490 U.S. 386, 397 (1989). Reed, however, had already been arrested and was in custody at the county jail. As such, Reed's claim arises under the Fourteenth Amendment, a standard that is more difficult for a plaintiff to meet. *See Darrah,* 255 F.3d at 306 (noting that excessive force under the Fourteenth Amendment is a "substantially higher hurdle" for the plaintiff to meet than the "objective reasonableness test of *Graham,* in which excessive force can be found if the officer's actions, in light of the totality of the circumstances, were not objectively reasonable") (internal quotation marks omitted).

Moreover, this case is not a reprise of *Harris v. City of Circleville*, 583 F.3d 356 (6th Cir. 2009). In *Harris*, police officers had placed Harris in handcuffs with his hands behind his back. *Id.* at 360. While one officer told Harris to kneel down, another held Harris's hands up, making it impossible for Harris to comply with the command to kneel. *Id.* at 361. The officers then forcibly subdued Harris and deployed a Taser. Critically, the court recognized that "Harris was not doing anything to resist." *Id.* The deputies here, in contrast, used the Taser only after multiple warnings and, more importantly, multiple attempts to wrestle Reed's arms behind his back.

We also do not believe that the the deputies were constitutionally required to exhaust *all* possible alternatives before using a Taser. Our dissenting colleague proposes that the deputies could have finished handcuffing Reed in front of his body or waited until Reed had recovered from the lingering effects of the seizure. The first proposed alternative raises an impossible hypothetical—one which finds no support in the record, is not advocated by Reed himself, and cannot be determined from the video recording. Indeed the recording shows that Reed began thrashing each time the deputies attempted to secure him, not that he was averse only to placing his hands behind his back.

And requiring the deputies to wait until Reed had fully recovered from the seizure's lingering effects would have placed the deputies in an impossible Catch-22

situation: wait too long and risk being accused of the "unnecessary and wanton infliction of pain" by their deliberate indifference to Reed's serious medical needs, *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted), or act too quickly and risk being charged with "deliberate indifference towards the plaintiff's federally protected rights," *see Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (internal quotation marks omitted). We decline to put the onus on the deputies to assess at their risk the seriousness of Reed's seizure in order to determine whether it warranted immediate medical treatment. Their decision to use a Taser to subdue Reed before taking him to the hospital might have been unwise, but it was not unconstitutional.

**B. The Hospital Incident**

Likewise, we agree with the district court's determination that Deputy Dishong did not violate Reed's constitutional rights during the Hospital Incident. Dishong testified that as soon as Carter was gone, Reed turned to his left and began muttering and squatted on the bed. He told Reed to "lay back down," but Reed did not heed the command. Instead, Reed asked Dishong "Do you want a piece of me?" and lunged toward Dishong with his hands raised. Dishong explained that he had "no way of retreating" because of the cramped quarters and Reed's position over him while standing on the bed. With these considerations in mind, Dishong Tased him.

This testimony does not support the conclusion that Dishong was "afforded a reasonable opportunity to deliberate," and Reed offers no evidence of his own. *See Darrah*, 255 F.3d at 306 (internal quotation marks omitted). On the record before us, there can be no dispute that the Hospital Incident was "a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation . . . ." *Id.* (internal quotation marks omitted).

In this context, Reed must show that Dishong's actions "involved force employed maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore discipline." *Id.* (internal quotation marks omitted). He

directs us to no such proof.  Absent any evidence in the record that Dishong acted with malicious or sadistic intent, a jury would not be entitled to so find.

The dissent responds by arguing that Dishong may have violated the county's use-of-force policy prohibiting the use of Tasers on inmates who are restrained by leg irons.  But the dissent cites no authority for the proposition that any violation of a county's use-of-force policy equates to a constitutional violation. The relevant question, in other words, is not whether Dishong used his Taser on an inmate restrained by leg irons, but whether he did so "maliciously and sadistically for the very purpose of causing harm." *Id.* (internal quotation marks omitted).  On this question, the evidence is beyond dispute that he did not.  Summary judgment in favor of Dishong was therefore appropriate.

## V.  CLAIMS AGAINST FRANKLIN COUNTY

We now turn to Reed's claims against Franklin County, which  rely on *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  *Monell* held that "[l]ocal governing bodies . . . can be sued directly under § 1983 . . . where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690.  But "[l]iability against [a local government] arises only if it violated a constitutional or statutory right through a custom or practice of doing so." *Hidden Vill., LLC v. City of Lakewood*, 734 F.3d 519, 523 (6th Cir. 2013).  Because we conclude that Reed suffered no violation of his constitutional rights, Reed's claims against Franklin County fail.  His *Monell* claims are therefore without merit.

## VI.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.   The majority suggests that Plaintiff Michael Reed fails "to 'go beyond the pleadings' and identify admissible evidence of the essential elements of his claim," *see* Majority at 13 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); I strongly disagree.   Reed's allegations are supported by convincing evidence: the video recording of the events that transpired in Reed's jail cell and depositions in which the officers admit to thrice tasing a non-violent individual in the immediate aftermath of a seizure.   To bolster its argument that Reed's claim rests solely on the pleadings, the majority seems to suggest that Reed submitted "only" one sentence in response to Defendants' motion for summary judgment and failed to cite to any evidence in the record.   *See* Majority at 13.   This is misleading; Reed's response to Defendants' motion for summary judgment was eighteen pages long, and referred repeatedly to the video recording in the record. Because the majority, like the district court below, misapplies the holding of *Scott v. Harris*, 550 U.S. 372 (2007), and by doing so usurps the role of the jury, I respectfully dissent.

**I.**

My disagreement begins with the majority's narration of the facts in this case. The evidence in the record, including the video, establishes the facts as follows:

As the result of an accident that caused a traumatic brain injury many years ago, Reed suffers from both tonic clonic seizures (stiffening and rigidity of muscles followed by rhythmic jerking motions) and complex partial seizures (the person appears to stare blankly and loses contact with his surroundings, often followed by chewing movements, mumbling, and unorganized movements).   Like many who suffer from seizures, Reed usually does not recall having the seizure and becomes confused, disoriented, and fatigued in the aftermath.

In August 2008, Reed had a seizure while walking on the street. Emergency medical technicians ("EMTs") responded to the scene, and Reed allegedly became aggressive and assaultive when an EMT rapidly approached him to try to take him to the hospital. Instead of receiving medical attention, Reed was charged with assaulting a peace officer and taken to jail at the Franklin County Corrections Center II ("FCCCII").

On December 23, 2008, Judge Michael Holbrook of the Franklin County Common Pleas Court found Reed not guilty by reason of insanity ("NGRI") and ordered Reed to be committed to the Twin Valley Behavioral Healthcare Forensic Unit. However, due to overcrowding at the behavioral healthcare facility, Reed had to stay at FCCCII until a bed became available at Twin Valley. Although the court recognized that Reed did not belong at FCCCII due to his mental health and medical conditions, Reed was nevertheless sent to FCCCII, where he was treated as a prisoner.

On January 29, 2009, Reed had a seizure in his jail cell in FCCCII. Deputy James Jodrey called a "code blue medical," which signals that an inmate requires medical attention. *See* Att. Internal Affairs Report 09-048, Jodrey Statement, ECF No. 163-1. Corporal Sam Byrd and Deputies Sam Montrose, James Jodrey, Clayton Kern and Chris Starner (collectively, "officers") entered Reed's jail cell in response to the code blue. They were all aware that Reed had just had a seizure, and that they were to assist in transporting Reed to the hospital for medical treatment. *Id.* All of the officers were also aware that Reed gets disoriented and confused immediately following a seizure, and that Reed was not in a state to understand or obey their commands. *See* Att. Internal Affairs Report 09-048, ECF No. 163-1.

Reed was on the floor of his cell when the five officers entered. Reed was dazed, confused, and clearly disoriented. *See* Video at 00:00:00–00:00:29, ECF No. 160. For ten seconds, the five officers shouted rapid commands at Reed, demanding that Reed put his hands behind his back so that the officers could handcuff him. *Id.* at 00:00:01–00:00:12. It is clear from the video, and should have been obvious to the

officers, that Reed did not understand a single word that the officers said. Reed sat motionless on the floor with his hands up in "surrender" position and stared blankly at the five uniformed men in his cell. *Id.*

Although Reed did not put either of his hands behind his back, the officers attempted to handcuff him anyway. *Id.* at 00:00:13. Reed did not resist when one officer tried to put a handcuff on Reed's left wrist; in fact, Reed barely moved, and the officer secured Reed's left wrist without incident. *Id.* at 00:00:14–00:00:23. Reed did not respond to the officers' commands for him to put his right hand behind his back. *Id.* at 00:00:23–00:00:29. Reed sat with his hands in front of him, apparently unaware of what was going on in his post-seizure state. *Id.* One officer asked, "Has he not been taking his meds?" *Id.* at 00:00:24.[1] Another officer tried to grab Reed's right wrist and pull it behind his body to handcuff him, and Reed lightly moved his arm forward. *Id.* at 00:00:26–0:34. When the officer again tried to pull Reed's arm behind his back, Reed moved his arm and held it across his stomach and started to lie back down on the floor. *Id.* at 00:00:34–00:00:38. The left handcuff was attached to Reed's left wrist, and the right handcuff was open. The officers told Reed to sit up, and one deputy pushed him upright so that Reed was sitting on the floor, hunched over, with his hands folded in his lap. *Id.* at 00:00:40. The officers did not attempt to attach the open handcuff to Reed's right wrist when both of Reed's hands were in front of his body. Instead, two officers grabbed Reed's arms and attempted to pull Reed's hands behind his back. *Id.* at 00:00:43–00:00:46. Reed then twisted his torso to the left, falling onto his stomach. *Id.* at 00:00:46–00:00:49. Much of the scene is not captured on the video, but approximately three seconds later, it appears that Reed rolled onto his back and began groaning/shouting "Ahhh! Ahh! Ahhh!" *Id.* at 00:00:48–00:00:52. All five officers stood over Reed, shouting various commands.

At the 52-second mark of the video, we see clearly a red light—the laser used to aim the X26 taser gun—projected onto Reed's chest. As Reed lay on his back on

---

[1] Later, another one of the officers asks Reed twice, "Reed, have you been taking your meds?" *See* Video at 00:06:08–00:06:12, ECF No. 170.

the floor of his jail cell with his hands across his chest, the officers began shouting at Reed that he was "going to get tased" and "it [was] gonna fucking hurt bad." *Id*. at 00:00:52–00:01:07.  Reed continued to lie on the floor without speaking or making any threatening gestures.  *Id*. at 00:00:52–00:01:07.  The officers shouted at Reed and made one unsuccessful attempt to pry Reed's hands apart.  *Id*. at 00:01:12–00:01:17. Again the officers did not attempt to secure the open handcuff, which they could have done by attaching it to Reed's right hand when both of Reed's hands were in front of his body.  Within seconds, Byrd deployed the taser gun, delivering electric shocks through Reed's body for about ten seconds.  *Id*. at 00:01:17–00:01:27.  Reed began convulsing on the floor.

After Byrd tased Reed for the first time, Reed sat still with his hands up in "surrender" position, and he begged groggily, "please, please, please."  *Id*. at 00:01:29–00:01:38.  He appeared startled.  The officers continued yelling but Reed stared blankly at them.  *Id*.  In the video, the laser of the taser gun is visible on Reed's chest.  From 00:01:40–00:01:49, the camera was blocked by various officers standing in front of the lens, so we cannot see precisely what occurred.  It appears from the video that Reed kept his hands up in front of his body in "surrender" position.  Byrd continued shouting at Reed, as Reed continued to beg "please, please, please," and Byrd deployed his taser gun for a second time.  *Id*. at 00:01:49.  It appears from the video that Reed was then lying on the floor and groaning loudly.  We can infer from the audio that the officers were aware that Reed was nearly unconscious because one of them told Reed to "Wake up!"  *Id*. at 00:02:03, before asking "Do you want to get shocked again? Say no!  Say no!"  *Id*. at 00:02:08.

The deputies then handcuffed Reed behind his back.  *Id*. at 00:02:12–00:02:27.  With Reed in handcuffs, one officer commanded Reed to "roll over!" and Reed obliged.  *Id*. at 00:02:32.  All four deputies were crouched over Reed as he laid face down on the floor with his hands cuffed behind his back.  *Id*. at 00:02:43–00:02:49.  The scene is mostly obscured by officers standing in front of his

video camera, but it appears that the officers secured Reed's legs with leg irons.  *Id.* at 00:03:50–00:04:08.

Even after Reed was completely restrained in handcuffs and leg irons and laying motionlessly on the cell floor, the officers continued to threaten Reed with the taser gun.  *Id.* at 00:04:30 ("Are you gonna stand up now? Am I gonna have to tase you again?").  After the deputies pulled Reed to his feet and walked him down the hall to get medical treatment for a bleeding laceration on his forehead, Reed began to ask in a dazed voice, "What did I do? What did I do?"  *Id.* at 00:06:20.  Even after Reed was sitting calmly in the holding cell with his hands cuffed behind his back and his feet secured in leg irons, one of the deputies threatened him: "Don't move. I don't want to have to tase you again."  *Id.* at 00:07:08.

Deputies Christopher Dishong and Matthew Carter later transported Reed to the Mount Carmel Hospital West Emergency Room for further examination and treatment of the lesion on his forehead.  Dishong testified that after Reed received stitches for the cut on his head, Reed was sent to a section of the general emergency room area.  The deputies attached "leg irons" which connected Reed to the hospital stretcher.  According to Dishong's report, Carter left the room to go to the bathroom, and Reed squatted on the hospital bed and began to mutter under his breath.  There is no video of this incident, but Dishong claims that he ordered Reed to lie back down on the bed and warned Reed that he would be tased.  Reed did not comply, and allegedly "lunged" at Dishong (while Reed was still shackled to the bed); Dishong then tased him.  As a result, Reed fell off the bed, struck his head on the wall and floor, and sustained another head laceration, which required stitches.

Use of an X26 taser gun causes "neuromuscular interruption," which renders the subject unable to move and may cause him to fall.  *See* Exhibit Declaration and Policies, ECF No. 6-1.  People tased are especially at risk of injury if they are in a position where they could fall and suffer an impact injury to the head, are on an elevated or unstable surface, or are in restraints that incapacitate or immobilize them.  *Id.*

According to the Franklin County Sheriff's Office policy ("the Jail Policy"), Taser guns are to be deployed "to gain control of a violent or dangerous inmate when attempts to subdue the inmate by conventional tactics have been or are likely to be ineffective or there is reasonable expectation that it will be unsafe for deputies to approach within contact range of the inmate." *See* Exhibit Declaration and Policies, ECF No. 6-1. The Jail Policy permits taser deployment in the following circumstances: self-defense; protection of another inmate or staff; disarming an inmate under non-lethal conditions; preventing self-harm to an inmate; or controlling a combative inmate. *Id.* The Jail Policy specifically states that Tasers should not be deployed upon persons who are restrained by a mechanical device such as handcuffs, leg irons, or a restraint chair. *Id.*

## II.

We review *de novo* the district court's grant of summary judgment. *Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [Defendants are] entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 323. A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for Reed. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We determine simply "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that [Defendants] must prevail as a matter of law." *Id.* at 243. We must not weigh the evidence or make credibility determinations. *Id.* at 249; *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 900 (6th Cir. 2004). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. If Reed's account of the facts "does not require such a suspension of reality that no

reasonable juror could accept it, that is enough to allow a jury to hear the claim." *Jones v. Garcia*, 345 F. App'x 987, 990 (6th Cir. 2009). That he "may have a difficult time winning his case does not disable him from trying, at least so far as Rule 56 is concerned." *Id.*; *see also Kinzer v. Schuckmann*, 850 F. Supp. 2d 785, 794 (S.D. Ohio 2012) (denying summary judgment on the issue of qualified immunity even where "Plaintiff's excessive force claim . . . is thin at best").

In reviewing the district court's grant of summary judgment, we must adopt Reed's version of the facts. *Scott*, 550 U.S. at 378 (for summary judgment "[i]n qualified immunity cases, [we usually adopt] . . . the plaintiff's version of the facts"); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (we view the evidence and draw all inferences in the light most favorable to the nonmoving party); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008). There is an exception to this rule when the plaintiff's version of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it," *Id.* at 380, but this exception is inapplicable to the case at hand.[2]

Although the video recording of the so-called "Cell Incident" accurately captures the events that transpired, it "neither proves nor disproves [Reed's] claim" because the activity in the video is susceptible to more than one interpretation. *Dixon v. County of Roscommon*, 479 F. App'x 680, 682 (6th Cir. 2012). Though the majority suggests otherwise, Reed's interpretation of the events on the video is by no means "blatantly contradicted" by the video evidence. This is especially true because much of the activity in the video occurred outside of the frame or was otherwise obscured. Unlike in *Scott*, where the video recording so discredited the plaintiff's version of events that no jury could have believed it, a reasonable jury could believe Reed after viewing the video in evidence. *See Coble v. City of White House*,

---

[2]The majority quotes *Coble* for the proposition that "there is nothing in the *Scott* analysis that suggests that it should be restricted to cases involving videotapes." Majority at 8 (quoting *Coble v. City of White House*, 634 F.3d 865, 868–69 (6th Cir. 2011) (internal quotation marks omitted). In *Coble*, we considered whether the exception articulated in *Scott* would apply to an unambiguous audio recording that blatantly contradicted the plaintiff's version of the facts, and concluded that it would. This Court has never indicated that the holding of *Scott* extends beyond an unambiguous recording of the events in dispute.

634 F.3d 865, 868–69 (6th Cir. 2011); *Dixon*, 479 F. App'x at 682. Therefore, we must accept Reed's interpretation of the video for the purposes of this appeal.

In addition, we "must disregard all evidence favorable to [Defendants] that the jury is not required to believe." *Champion*, 380 F.3d at 900 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)). In other words, "the court should give credence to the evidence favoring [Reed] as well as that evidence supporting [Defendants] that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves*, 530 U.S. at 151. The district court should be affirmed "only if reasonable minds could not come to a conclusion other than one favoring [Defendants]." *Id.* (quoting *Garrison v. Cassens Transp. Co*, 334 F.3d 528, 537–38 (6th Cir. 2003).

Because I view the incidents of January 29, 2009 as a single event—a seizure followed by three tasings (two in the jail cell and one in the hospital)—I believe that Reed's entire claim should proceed to a trier of fact. That there is no video recording of the so-called "Hospital Incident" is not dispositive where the essential facts are undisputed: Shortly after Reed had suffered a seizure and received medical treatment for a head laceration, Dishong deployed his taser gun on Reed while Reed was shackled to a hospital bed with leg irons. The trier of the facts is entitled to look at the event in context, and may determine that Dishong's deposition testimony that Reed "lunged" at him is not credible.

**III.**

**1.    Individual Capacity Claims**

*Constitutional Violation*

I agree with the majority and the district court that Reed is entitled to constitutional protection under the Fourteenth Amendment. The test applied by the Supreme Court to determine whether governmental conduct violates an individual's substantive due process rights is whether the alleged conduct "shocks the conscience." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (citing

*County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998).**3**   As the majority recognizes, we apply different standards of "conscience-shocking" depending on the circumstances in which the governmental action occurred.  *See Darrah v. City of Oak Park*, 255 F.3d 301, 306 (citing *Lewis*, 523 U.S. at 850–51).  Where, as here, implicated government actors "are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action . . ., their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights."  *Claybrook*, 199 F.3d at 359 (quoting *Lewis*, 523 U.S. at 852–53).**4**   I agree with the majority that "[t]he video recording in this case provides sufficient evidence for a jury to find that the situation in the cell afforded the deputies a reasonable opportunity" for deliberation.  Majority at 11.

I therefore note that the district court applied an incorrect legal standard. The district court erroneously stated that "the defendant officers' conduct violates []Reed's constitutional rights only if they tased him maliciously and sadistically for the very purpose of causing harm rather than in a good faith effort to maintain or restore a safe environment."  Reed need not show that the deputies acted for the very purpose of causing him harm; only "in a rapidly evolving, fluid, and dangerous predicament" would Reed need to show that the officers had such nefarious intent. The law requires only that Reed cite evidence to support his allegation that the officers were deliberately indifferent to his right to be free from excessive force.  To satisfy this low burden, Reed points to the video recording of five officers brutally tasing him for failing to comply with their rapid-fire commands a mere moment after he had suffered from a massive seizure.  Reed has undoubtedly met his burden.

---

**3**The Supreme Court has also recognized that conduct that meets the deliberate indifference standard of the Eighth Amendment would violate the Fourteenth Amendment, since the protections afforded under the Fourteenth Amendment are at least as great as those under the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)); *see also Lewis*, 523 U.S. at 850.
**4**This Court has also recognized that the Fourteenth Amendment, "[a]t the very least. . . protects a[n individual] from the use of excessive force that amounts to punishment,'" *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008) (quoting *Phelps v. Coy*, 286 F.3d 295, 300 (6th Cir. 2002)).

Furthermore, I disagree with the majority's assertion that "there can be no dispute" that the so-called "Hospital Incident" was a "rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation." Majority at 16. The Supreme Court has applied a heightened standard in limited circumstances: namely a prison riot and a sudden high-speed automobile chase. *See Whitley v. Albers*, 475 U.S. 312 (1986) (prison riot is a rapidly evolving, fluid, and dangerous predicament); *Lewis*, 523 U.S. 833 (1998) (high-speed automobile chase is a rapidly evolving, fluid, and dangerous predicament). Even under the facts alleged in Dishong's deposition, we can hardly say that the situation was a "rapidly evolving, fluid, and dangerous predicament" on the same level as a prison riot or high-speed chase. When Reed squatted on the hospital bed and began to mutter, he was shackled to the hospital bed with leg irons; Dishong had time to deliberate his course of action. Even if Reed did appear to "lunge" at Dishong, the situation presented limited danger, if any, to anyone other than Reed since Reed was physically restrained by the leg irons.

In concluding that Defendants did not violate Reed's constitutional rights, the majority impermissibly relies on its own subjective interpretation of the video as well as Defendants' one-sided account of the facts. This analysis is improper on summary judgment. In light of all of the evidence, including the video, a reasonable jury could undoubtedly find that the officers' use of force shocks the conscience because it was taken with deliberate indifference toward Reed's federally protected rights.

In applying the Fourteenth Amendment standard to the use of tasers, "courts have focused on [the individual's] conduct when the taser was applied, the frequency and force with which it was applied, and the overall security needs of the institution." *Spears v. Cooper*, No. 1:07-CV-58, 2009 WL 838179 (E.D. Tenn. Mar. 30, 2009) *rev'd in part sub nom. Spears v. Ruth*, 589 F.3d 249 (6th Cir. 2009). With regard to the first factor, the evidence supports Reed's allegation that Reed was not actively resisting the officers' efforts to restrain him. Though Reed did not comply with the

officers' rapid-fire orders commanding him to put his hands behind his back, Reed's noncompliance alone is insufficient to justify the officers' use of force. *See Harris v. City of Circleville*, 583 F.3d 356, 361 (6th Cir. 2009) (holding that an arrestee who did not comply with officer's command to "kneel down" was not resisting); *Eldridge v. City of Warren*, 533 F. App'x 529, 533 (6th Cir. 2013) (holding that a person who remained in his vehicle despite officers' repeated commands for him to exit the vehicle was not actively resisting, and officers' use of a Taser gun to subdue the person was "objectively unreasonable" and violated the Fourth Amendment). This Court has recognized an important distinction between noncompliance and "active resistance." *Id.* at 535 ("noncompliance alone does not indicate active resistance; there must be something more"); *Harris*, 583 F.3d at 361 ("Other than not complying . . . [plaintiff] was not doing anything to resist. [Plaintiff] does not appear to be resisting on the videotape.").[5] Based on the evidence presented, a reasonable jury could conclude that Reed was merely noncompliant, and was not actively resisting. Since the video supports both parties' proffered interpretations of Reed's behavior, there is a genuine issue of fact regarding whether or not Reed was resisting. We must resolve this factual dispute in Reed's favor for the purposes of our analysis of the issue on appeal.

The evidence also supports Reed's allegation that Reed did not pose a substantial risk to the safety of himself, the officers, or third parties. The majority claims that Reed has not offered any evidence to contradict Defendants' testimony that the open handcuff presented a substantial safety risk; I disagree. The majority fails to consider that the video itself casts doubt on Defendants' testimony, since it is clear in the video that the officers had ample opportunity to secure the open handcuff on Reed's right hand in front of Reed's body, and they did not do so. It was foreseeable that an individual in Reed's disoriented state might reflexively pull his arms forward when an officer attempts to pull them behind his back, yet the officers

---

[5]*Eldridge* is not the only case in this Circuit to recognize a distinction between active resistance and noncompliance. Though the majority may believe that Reed's case "is not a reprise of *Harris v. City of Circleville*," Majority at 15, it cannot deny that *Harris* recognizes a distinction between resistance and noncompliance.

nevertheless decided to handcuff Reed's left wrist while Reed's hands rested *in front of his body* and *then* tried to pull Reed's hands behind his back.[6] If a loose handcuff presented such a threat to the officers' safety, then the officers would have first positioned both of Reed's hands behind his body before handcuffing one of Reed's wrists. Alternatively, the officers could have waited until Reed "came to" before trying to handcuff him at all. Or, under the circumstances (having not done either of the above), the officers could have simply secured the loose handcuff by attaching the open handcuff to Reed's right wrist in front of Reed's body (which would have neutralized the purported safety risk). I raise these possible alternatives *not* because I believe that the deputies were constitutionally required to exhaust all possible alternatives before using a taser, but because the fact that the deputies passed up these opportunities casts doubt on the credibility of the officers' professed belief that the open handcuff posed any substantial threat to their safety. While Reed could certainly benefit from expert testimony purporting to refute the testimony submitted by Defendants, such testimony is not required for Reed to survive a motion for summary judgment where a reasonable interpretation of the video contradicts Defendants' testimony. There is a genuine issue of material fact as to whether or not the open handcuff presented a substantial risk to the officers' safety, and we must resolve this factual dispute in Reed's favor for the purposes of our analysis of the issue on appeal.

The majority asserts that certain "facts" compel its conclusion that none of the deputies acted with deliberate indifference: namely, that the officers tried to handcuff Reed "several times" before using the taser and that the officers warned Reed that the taser would hurt. While I agree that these facts *could* support a jury's decision that the officers' conduct did not rise to the level of a constitutional

---

[6]The majority mischaracterizes the argument of the dissent. *See* Majority at 13. The dissent does not suggest that the fact that Reed's movement was unintentional automatically renders the officers' conduct conscious-shocking. To the contrary, I agree with the majority that the constitutional inquiry centers on the deputies' intent, and not Reed's intent. However, for the reasons I have explained above, the fact that Reed's movement was reflexive and foreseeable is relevant to our inquiry regarding the deputies' intent. I question the deputies' intent—and the integrity of their belief that the open handcuff was "a major danger" that could have been used as a deadly weapon—where the video clearly shows that the officers passed up several opportunities to prevent, or at least neutralize, the "dangerous situation" presented by an open handcuff.

violation, I strongly disagree that these facts *compel* such a conclusion. On the contrary, the video offers considerable support for the conclusion that the officers acted with deliberate indifference to Reed's federally protected rights (or, alternatively, that the officers used excessive force that amounted to punishment). Specifically, the record shows that the officers were fully aware that Reed had just suffered from a serious seizure, and they were supposed to help him to get medical assistance; yet, within fifty-two seconds of entering the cell, Byrd was already preparing to use his taser gun on Reed. Although Reed was clearly dazed and discombobulated, the officers did not make any genuine effort to help Reed snap back to alertness or wait until Reed was responsive before trying to handcuff him. Instead, not much more than one minute after Reed suffered a seizure, Byrd brutally subdued Reed with a taser gun. The video shows the officers treating Reed more like a dog than a human—commanding him to "sit up" and "roll over," and punishing him at the first sign of non-obedience. Had Reed been in the hospital instead of a jail cell, there is no question that the officers' behavior would be considered conscious-shocking.

I also disagree with the majority's suggestion that "wait[ing] until Reed had fully recovered from the lingering effects of the seizure before taking him to the hospital for medical treatment" would have placed the officers "in an impossible Catch-22 situation: wait too long and risk being accused of the 'unnecessary and wanton infliction of pain' by their deliberate indifference to Reed's serious medical needs, or act too quickly and risk being charged with 'deliberate indifference toward the plaintiff's federally protected rights.'" Majority at 15–16. This alleged Catch-22 is a false dichotomy. There is a wide range of constitutionally acceptable behavior that neither involves excessive force nor unnecessary delay of access to medical treatment. The officers certainly could have waited more than fourteen seconds before approaching Reed to try to handcuff him while Reed was clearly discombobulated. Or they could have handcuffed Reed in front of his body, since it is foreseeable that an individual in Reed's disoriented state might reflexively pull his arms forward when an officer attempts to pull them behind his back. Instead, the

officers shouted rapid-fire commands at a virtually catatonic, non-threatening individual for twelve seconds before they approached him and tried to "wrestle" him into handcuffs, and prepared to shock him multiple times with a taser gun less than forty seconds later.

The majority emphasizes the number of times that the officers shouted commands and warnings, but their narration obscures the fact that this entire scene took place in a span of *less than eighty seconds*. For the first thirty seconds, Reed stared blankly into space while the officers shouted. Reed made no movement at all. Reed did not resist (arguably he did not even notice) when the officers placed a handcuff on his left wrist while both of his hands were in front of his body, and Reed only began to pull forward when the officers tried to pull Reed's right arm behind his back.

The record viewed in the light most favorable to Reed establishes that each of the officers knew that Reed had just suffered from a seizure, that Reed was not actively resisting, that Reed did not pose a threat to the officers, and that Reed was tased three times (twice in the cell, and once in the hospital). The record also supports the inference that Reed was not "violent or dangerous," and that the officers' use of the taser violated the Jail Policy. Although Reed has not offered expert testimony to refute Defendants' testimony that the open handcuff presented a substantial threat to the officers' safety, Reed can rely on the video to refute this notion, since the video clearly shows that the officers had ample opportunity to secure the open handcuff by cuffing Reed's right wrist in front of his body, and they did not do so.

With regard to Dishong's use of the taser, even if we accept as true Dishong's testimony that Reed "lunged" at Dishong, the evidence viewed in the light most favorable to Reed shows that Reed was shackled to a hospital bed in the aftermath of a seizure and medical operation, and did not pose a substantial risk to Dishong. The evidence also supports the inference that Dishong's use of the taser violated the Jail Policy, which specifically states that tasers should not be deployed

upon persons who are restrained by leg irons. Moreover, Dishong was aware that Reed was especially at risk of injury, since Reed was on an elevated, unstable surface (the hospital bed), in a position where he could fall and suffer an impact injury to the head (crouching), and was in restraints that immobilized him (leg irons).

A jury could reasonably conclude that the officers' use of a taser gun on a non-threatening, mentally ill individual in the immediate aftermath of a seizure shocks the conscience because it was taken with deliberate indifference toward Reed's right to be free from excessive force. At the very least, the evidence presented raises an issue of material fact as to whether the officers' behavior shocks the conscience, and summary judgment on the issue of qualified immunity was therefore improper.

*Clearly Established Right*

Each of the officers should have known that his behavior violated Reed's constitutional rights. It is well established that the Due Process Clause of the Fourteenth Amendment protects individuals from abusive government conduct that "shocks the conscience," *Lewis*, 523 U.S. at 834, and from excessive force that amounts to punishment, *see Leary v. Livingston County*, 528 F.3d 438, 443 (6th Cir. 2008) (citing *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)), or "unnecessary and wanton infliction of pain," *Whitley*, 475 U.S. at 320–21.

In the context of the Fourth Amendment, we have previously recognized that "[o]fficers should [know] that the gratuitous or excessive use of a taser violate[s] a clearly established constitutional right." *Landis v. Baker,* 297 F. App'x 453 (6th Cir. 2008) (citing *Hickey v. Reeder*, 12 F.3d 754, 757 (8th Cir. 1993) ("a stun gun inflicts a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless" and its use without a legitimate reason might violate the Eighth Amendment)). In applying the Fourteenth Amendment standard specifically to the use of tasers, "courts have focused on detainees' conduct when the taser was applied, the frequency and force with which it was applied, and the overall security needs of the institution." *Spears*, 2009 WL 838179.

In the case at hand, the evidence viewed in the light most favorable to Reed establishes that Reed was not actively resisting, that Reed did not pose a threat to the officers, and that Reed was tased two times in his jail cell. Each of the officers present in the cell was aware that Reed had a serious medical condition, and that he had just suffered from a seizure. Nevertheless, within eighty seconds of entering Reed's cell in order to transport him to the hospital, Byrd decided to deploy his X26 taser gun, causing "neuromuscular interruption" and a great shock for the disoriented victim. Byrd did so in spite of the fact that the Jail Policy instructed officers to deploy taser guns only for self-defense, protection of another inmate or staff, disarming an inmate under non-lethal conditions, preventing self-harm to an inmate, or controlling a combative inmate. The evidence, including the video, viewed in the light most favorable to Reed, establishes that Reed was not threatening, combative, or armed. Under these circumstances, a reasonable officer should have known that use of the taser would violate Reed's due process rights.

Similarly, even if we accept as true Dishong's testimony that Reed "lunged" at him, the evidence viewed in the light most favorable to Reed supports the conclusion that Dishong's decision to use the taser under the circumstances was made with deliberate indifference to Reed's constitutionally protected rights.

In the instant case, Reed's clearly established constitutional right is the right to be free from excessive force that "shocks the conscience." In light of this right, it was objectively unreasonable for the officers to tase Reed repeatedly when he needed medical attention and was not actively resisting. Reed has submitted evidence in the form of deposition testimony and a video recording of part of the incident. After reviewing this evidence, I believe that it is sufficient to support Reed's claim that Defendants' actions were objectively unreasonable in light of clearly established law.

Additionally, "the fact that only [Byrd and Dishong] pulled the trigger on the taser does not absolve [the other officers] of liability." *Landis*, 297 F. App'x at 464 (citing *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982) ("it is not necessary, in order to hold a police officer liable under [§]1983, to demonstrate that the officer

actively participated in [using force against] a plaintiff"). There is evidence that the other officers encouraged the use of the taser and made no attempt to thwart the use of the taser on Reed. A reasonable jury could conclude that the other officers "had the means and opportunity to prevent the harm" to Reed, and that their failure to do so was conscience-shocking.

**2.       Remaining Claims**

The district court dismissed Reed's remaining claims—Reed's claims against the officers in their official capacities as well as his claims against Franklin County, which rely on *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)—based on its conclusion that Reed did not suffer a violation of his Fourteenth Amendment rights. For the reasons discussed *supra*, I believe that Reed has stated a constitutional violation, and so dismissal of these claims on this ground was erroneous.

**IV.**

For the foregoing reasons, I disagree with the majority, and would reverse the order of the district court and remand the case for further proceedings consistent with this opinion.